40 N.J. Super. 371 (1956)
123 A.2d 67
HORACE N. RUBENSTEIN, PLAINTIFF,
v.
NATALIE RUBENSTEIN AND NATALIE'S REALTY CO., INC., A BODY CORPORATE, DEFENDANTS, AND FRANK GRANT, INTERVENING DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided May 25, 1956.
*373 Mr. Ward Kremer, attorney for plaintiff.
Mr. Theodore D. Parsons, attorney for defendants (Messrs. Parsons, Labrecque, Canzona & Combs, attorneys).
Mr. M. Raymond McGowan, attorney for intervening defendant (Messrs. Barkalow, McGowan & Krusen, attorneys).
*374 CONFORD, J.A.D. (temporarily assigned).
This is an action by the plaintiff to rescind an agreement which he made with the defendant Natalie Rubenstein, his former wife, on October 5, 1953, pursuant to which he conveyed to a corporation almost wholly owned by her all of his interest in two parcels of real property, one referred to as "Marlboro Farm" in Marlboro Township, and the other the "Factory Property" in the Borough of Farmingdale, and to set aside the conveyances executed pursuant to the agreement the same day, on grounds of duress. The parties were husband and wife until October 1955, when a final judgment of divorce was granted to him on his counterclaim for extreme cruelty in an action for divorce brought by her on the same ground. She did not contest the counterclaim. The intervenor, Frank Grant, holds a contract to purchase a portion of the lands at the Marlboro Farm, entered into with the defendant Natalie's Realty Co., Inc. in December, 1953. Consummation of that sale has been held in abeyance pending the outcome of this action.
The plaintiff seeks in the present action to compel the individual defendant (hereinafter referred to as defendant) to reconvey to him a one-half interest in the real property in question or, in the alternative, to issue to him shares of capital stock in the defendant corporation equalling one half of the total outstanding stock therein. He further seeks the establishment of a lien upon the proceeds of the sale of lands in his favor to the extent of one-half and asks an adjudication that the defendant is seized of the real estate in question as trustee for two infant children of the marriage.
In addition to a denial of the charge of duress, the defendant submits defenses of ratification, laches, unclean hands, and estoppel, and the intervenor contends that he became the equitable owner of the lands which he contracted to purchase and that his interest is superior to any equity of the plaintiff. As I view the proofs, however, it becomes necessary for me to determine only one basic issue, i.e., whether or not the evidence adduced at the two-week trial establishes a case of such duress exercised upon plaintiff as *375 will move the court to set aside the transactions of October 5, 1953.
Plaintiff contends that the acts of duress which resulted in his conveyances to the defendant of the properties in question commenced in December 1952 and continued until his submission to the defendant's demands on October 5, 1953. He says that beginning in December 1952 she threatened to have him "beaten up by gangsters" and to give him arsenic and expressed a wish for his death; that he was reduced to a state of fear for his life and safety by these statements; that these threats, beginning in April 1953, were accompanied by insistent and repeated demands on her part that he convey his interest in the properties to her; and that she exercised further duress upon him by having him arrested for non-support and desertion on August 6, 1953 and threatening to prosecute that claim "to the hilt" unless he made over the properties to her. These activities on her part assertedly resulted in his capitulation and conveyance of his interests on October 5, 1953.
The defendant submits a wholly different version. It is this. The parties were married in 1942 and managed to accumulate some real estate through the financial aid and assistance of the defendant's relatives. They were reasonably well adjusted as a married couple until the winter of 1952-1953, except for occasional expressions of intention by the plaintiff to leave the country and make a livelihood in other parts of the world, such as Arabia, Israel and Saskatchewan, intimations which left her with a feeling that he wanted to abandon her and their children. One child was born in 1948 and the other in 1952. Early in 1952 he broke up a business partnership with his father consisting of a poultry farm and told his wife that unless they could arrange to build a chick hatchery at his own farm in Marlboro, he would leave to make his livelihood in Arabia. He went so far as to dictate to her a form of agreement on February 25, 1952, conveying all his realty to her in return for her assumption of all his debts, the costs of a divorce proceeding, and support of the children for two years. This writing *376 was never executed. At a family conference consisting of both his relatives and hers, attempts were made to persuade him to abandon the idea of a hatchery at Marlboro on the grounds that they were already overburdened with debts incurred in acquiring their property and that the hatchery would not be feasible economically. He refused to heed this advice, and the hatchery project was undertaken to keep him satisfied with the aid of loans advanced by the defendant's relatives. It went into operation in the fall of 1952 and ceased operation April 1953, apparently a failure. The hatchery project involved a total expense and indebtedness of some $15,000.
In December 1952 the older child developed a mental illness, and the parties were in considerable disagreement over his treatment. The condition was diagnosed as "childhood schizophrenia." Defendant was loath to accept the diagnosis and her efforts to continue with medical consultations met objections by the plaintiff, who was satisfied with the medical verdict and wanted the child committed to an institution at once. The child was finally committed to the Brisbane Psychiatric Center on July 13, 1953 and has been continually confined in one institution or another ever since.
The defendant's contention is that the failure of the hatchery, the illness of the child, the press of debts, and his general instability led the plaintiff to desert her on July 20, 1953, after a period of months in which he frequently threatened such action and repulsed efforts by his wife and members of her family to persuade him to keep the family together. He went to live with his parents at Farmingdale, some 12 miles from the Marlboro Farm. When he left he gave no indication of where he was going and hinted that he was leaving the country. He returned, allegedly to visit the remaining child, early in August, and the defendant asked what he was going to do about provision for her support. His response was that he was not working and that he would not support her, but that she could subsist by using rents from apartments at the farm property. She remonstrated on the ground that the rents were needed to pay *377 carrying charges on the property and to help reduce their many outstanding indebtednesses. Being of the opinion that he did not intend to return to her and might still leave the country, leaving her unable to liquidate the realty, she asked him to convey the properties to her, in return for which she would assume all of their obligations and the support and maintenance of the children. He refused. On the occasion of his next visit to the farm, August 6, 1953, she had him arrested for non-support after consultation with and upon advice by counsel. The charge against him was based on N.J.S. 2A:100-2. He was released on bail the next day and from thenceforward visited the farm about twice a week, on each occasion visiting with the younger child and discussing a final property settlement with the defendant. She contends that her demand on these occasions was always either for support or for conveyance of the properties, subject to the conditions already mentioned. She admits that she told him that unless she got support or a conveyance of the property, she would prosecute the pending complaint. Both he and she were separately represented by counsel during the negotiations. Finally, a week or two prior to October 5, 1953, they agreed upon his conveyance of the properties to her in return for her assumption of all of their debts and liabilities and her agreement to relieve him of any obligations for the support of herself and the children. She contends that his execution of the deeds for the properties and of the agreement pursuant to which they were executed were the result solely of his own conception, aided by legal advice, of what was for his own best interests and convenience, that he was in no fear whatsoever at any time, and that he deliberately consummated what he thought was a good deal for himself.
The consideration of the evidence by the court must be premised upon the initial assumption that plaintiff did what he did as a matter of his own free will. The burden of proof is his to establish the contrary. "Duress is not to be presumed and, therefore, it is incumbent upon these complainants to prove that the alleged coercion actually *378 subjugated their minds and was the efficient cause of the course of action they pursued." Ewert v. Lichtman, 141 N.J. Eq. 34, 36 (Ch. 1947).
In the appeal from a prior judgment in this case, the Supreme Court recapitulated the principles controlling in an action to avoid a contract or conveyance on grounds of duress. Rubenstein v. Rubenstein, 20 N.J. 359 (1956). The court said (20 N.J., at page 366):
"It would seem to be basic to the legal concept of duress, proceeding as it does from the unreality of the apparent consent, that the controlling factor be the condition at the time of the mind of the person subjected to the coercive measures, rather than the means by which the given state of mind was induced, and thus the test is essentially subjective."
The court went on to cite, with approval, the following language from Fountain v. Bigham, 235 Pa. 35, 84 A. 131 (Sup. Ct. 1912):
"`The threat must be of such a nature and made under such circumstances as to constitute a reasonable and adequate cause to control the will of the threatened person, and must have that effect; and the act sought to be avoided must be performed by such person while in such condition.'" (20 N.J., at page 366)
We deduce from the foregoing an intent by the Supreme Court to require no more, as respects causal relationship between the acts of alleged duress and the performance sought to be avoided, than that the coercive action be an efficient cause of the making of the agreement or contract, as specifically articulated in the Ewert case, supra, rather than that the coercive measures be shown to be "the sole and efficient cause of the action" (emphasis supplied), as stated by the Court of Errors and Appeals in Prudential Insurance Co. of America v. Fidelity Union Trust Co., 128 N.J. Eq. 327, 330 (E. & A. 1940). In other words, if it can be shown that the action sought to be avoided would not have taken place had it not been for the alleged coercive acts by the defendant, the transaction will be deemed to have been procured by duress, notwithstanding that it may *379 be shown that there were also other contributory, efficient causes of the action sought to be avoided. See 1 Black on Rescission and Cancellation (2d ed. 1929), § 223, p. 630. Compare the definition of an "efficient cause" in White v. Ellison Realty Corp., 5 N.J. 228, 234 (1950), as an "`act or omission which directly brought about the happening complained of, and in the absence of which the happening complained of would not have occurred.'"
In addition to the legal problem of cause and effect, it is also necessary to determine whether the coercive actions by the defendant complained of were "wrongful," or, if "lawful means," whether they were used oppressively. As was stated in the Rubenstein case, supra (20 N.J., at p. 367):
"But the pressure must be wrongful, and not all pressure is wrongful. And means in themselves lawful must not be so oppressively used as to constitute, e.g., an abuse of legal remedies. Williston on Contracts, sections 1606, 1607. The act or conduct complained of need not be `unlawful' in the technical sense of the term; it suffices if it is `wrongful in the sense that it is so oppressive under given circumstances as to constrain one to do what his free will would refuse.'"
We proceed first to a discussion of the evidence and a statement of the conclusions of the court with respect to the existence of the duress and as to its relationship to the transactions on October 5. Plaintiff's testimony was that the first threat to have him beaten up by gangsters was in December 1952, during the course of an argument over treatment of the ill child. It is significant that this occasion had nothing to do with any demand by her for the property. He testified the first such demand was in April 1953. He says such threats were repeated in May or June 1953, when he refused demands by her that he turn over the property. The only circumstantial support for his asserted fear that her threat was real was his citation of an occasion when she suggested they burn down the barn to realize the insurance and mentioned certain particular individuals who would do this for them. He failed to specify the names. She categorically denied the charge and testified that it was he, *380 on the contrary, who had made such a suggestion and that she had refused to countenance it.
Much emphasis is placed by the plaintiff upon a threat which he said she made on or about July 20, 1953, in the course of a demand by her and refusal on his part to turn over the properties. He says she said to him, "I'll give you some arsenic." He does not testify that she made this threat conditional upon his refusal to turn over the property. It is submitted on his behalf that such was the implication. He says he was frightened and his "spine contracted." He slept in the same bed with her that night and the next. She denied the charge and testified that the first time she ever knew that there was any contention on his part that any such threat was the cause of his turning over the properties to her was when she was served with the summons and complaint in the present action. Plaintiff testified that he was alarmed at her remark because he believed she meant it and was capable of executing the threat, as she was the daughter of a man who had been convicted for murder in Pennsylvania and sentenced to life imprisonment as a member of an arsenic poisoning ring in a scheme to mulct life insurance companies by homicide of their assureds. He acknowledged that his wife had informed him of the circumstances pertaining to her father before they were married. The defendant points out that her father's record is the only blemish on her family; that a brother is an accountant, practicing his profession in New York; another brother is an agent of the United States Department of the Treasury in its Tax Fraud Division; a sister is married to a dentist in Philadelphia; and another sister is married to a New York lawyer. The defendant, herself, at the time she married plaintiff, was working as a clerk in a jewelry store in Asbury Park. Her personal record seems unexceptionable.
A further allegedly disturbing element to plaintiff's peace of mind was the fact that during the period under discussion there was outstanding a $30,000 life insurance policy on his life, containing a double indemnity clause for accidental death, of which his wife was the beneficiary. He *381 testified that the existence of this policy, coupled with remarks by her that he should "drop dead" and that she wished he were dead, led him strongly to fear for his life during the summer of 1953. It is difficult to understand the implication of the argument advanced on plaintiff's behalf in this regard, unless it is merely to show that he was generally apprehensive of the defendant. The supposed motive on the part of defendant to do away with the plaintiff to realize on his life insurance policy would have no apparent factual relationship with the alleged duress to procure his conveyance of the real estate. As a matter of fact, plaintiff testified that his fear of death at the hands of the defendant was nourished by his knowledge that she would through his demise not only come into the insurance but would acquire the real property as survivor.
I have no hesitancy in coming to the conclusion that the plaintiff has failed to sustain his burden of establishing that the "gangster" and "arsenic" threats produced in the plaintiff any fears which played a causal role in inducing his conveyance of the real estate. In the first place, I am inclined to credit the defendant's denial that any such threats were made. Plaintiff's testimony at the trial herein was ridden with contradictions by his testimony on depositions and at the prior trial, exposed during cross-examination in instances too numerous here to relate. His long hesitations before answering many of the questions which were addressed to him, whether by opposing counsel, his own counsel, or by the court, his penchant for responses in terms of self-serving conclusion and his general demeanor as a witness left the court with a distinct impression that his testimony was not frank and forthright but deliberately calculated to satisfy what he had learned were the legal prerequisites for a case of duress.
There is nothing in the character, background or education of the defendant, or in the history of the marital association of these parties, that would lend support in probability to the plaintiff's claim that the defendant either threatened to have him beaten up by gangsters or to poison *382 him with arsenic, much less to force conveyances from him by such threats. While the evidence impresses me that the defendant was a purposeful and intelligent woman of strong will and resourcefulness, I detect no clues whatever to a disposition for violence, and I am of the opinion that she was not capable of threatening violence or murder against her husband as a means of securing a property advantage and, moreover, that she in fact never did so. Defendant concedes that she did, on one occasion when the plaintiff visited the farm after he had left the family, say to him, "I'd be better off if you were dead." Plaintiff cites this and other alleged comments, such as "I wish you were dead," as evidence of homicidal predilection against him on her part. It is a matter of common experience that expressions of this kind are generally outbursts of anger or animosity rather than threats of murder. Defendant explains that she made the remark she admits to after a visit which the plaintiff had made to the farm in her absence, after he deserted her, during which he broke into the house and seriously frightened her mother, who was convalescing there with a cast on her broken leg.
While it is true, as held by the Supreme Court in the former appeal in this case, that testimony by the subject is competent proof of his state of mind, nevertheless such proof deserves no greater probative weight than is warranted by its consistency with the subject's behavior. Actions speak louder than words. Plaintiff's conduct completely belies his assertion of mortal fear of defendant. He testified that the "arsenic" threat on or about July 20, 1953 had the immediate result of inducing him the following day to agree to convey the properties. Nevertheless, the very next day he advised the defendant and their counsel that he had changed his mind, and he moved out of the premises. He explains he reneged because he felt safer off the premises. Yet he says that every time he travelled, especially at night, he still feared assault by agents of his wife. Moreover, he kept returning to the farm two or three times a week, except for one week when he was on a trip to Milwaukee, during the *383 period between July 22 and October 5, 1953. On one visit he maliciously disabled the defendant's automobile. On another occasion, he got into a fracas with her over a tin box which he wanted to remove from the premises. He testified on depositions that when he visited the farm he would drink cognac which he had left there and that he had no fear that there would be any arsenic in the liquor. I cannot believe from the proofs that he was in the slightest fear of physical harm at defendant's hands or auspices at any time.
Plaintiff makes much of a visit that he made to his sister in New York City the same day in July 1953 he left the defendant and of her testimony that he was extremely upset on the occasion, as manifested by his appearance and by a continual attack of diarrhea during the two hours he spent at her apartment. He admitted, however, that at the time of the visit he was disturbed over having left his wife and family. There is other evidence in the case that he was diarrhetic prior to this occasion, and I conclude that his state of mind and upset condition were attributable to the emotional impact of his desertion of his family and perhaps to disturbance over the illness of his child, who had been sent to an institution only nine days previously.
Whether or to what extent there was any causal relationship between the impending criminal proceedings instituted by the defendant against plaintiff for desertion and non-support and the execution by him of the conveyances is problematical. He had legal counsel who arranged for his release on bail on August 7 and advised him thereafter with reference to his legal problems, generally, until the effectuation of the property settlement on October 5. In my judgment, based upon the proofs, it was not the pendency of the criminal proceedings, as such, which constituted a compulsive influence on the plaintiff, but, rather, his desire to be relieved of any further pecuniary obligations to his wife and children, obligations which he knew were enforceable at the instance of the defendant, whom he had deserted, either through civil or criminal proceedings. The withdrawal by the defendant of her charge against him was not a stipulated condition of *384 the settlement but, rather, a contemplated incident thereof. I believe that plaintiff knew, whether on the basis of advice of counsel who represented him in connection with the desertion proceedings, or otherwise, that if he resumed his obligation to support his wife and children, he had no substantial basis to fear conviction or actual incarceration, although it was possible. I conclude that it was not fear of prosecution on the pending charge which entered into his decision to turn over the properties but (along with other motivations mentioned later) his desire to purchase freedom of any further responsibility for the support of the defendant and the children (except to the extent of actual maintenance charges for the older boy so long as he might be institutionalized; at the time there was no charge being made by the Brisbane Center).
Plaintiff contributed absolutely nothing to the support and maintenance of his family from the day he deserted them in July 1953, except to pay $7 for shoes for the older boy. He conducted lengthy negotiations with the defendant, personally and through counsel, involving various propositions for division of the properties and maintenance payments, but not a single one of those proposals was an unconditional tender on his part of a reasonable sum to maintain the defendant and the children. He made offers to send her $30 or $40 a week, but I accept the defendant's testimony that these were entirely conditional upon her vacating the Marlboro property and personally assuming and relieving him of certain of their business indebtednesses. The defendant's testimony as to this was unequivocal and plaintiff failed to refute it. She testified that she even proposed to him that she vacate the property and live somewhere else if he would advance her $500 for the purpose of setting up an apartment, in which case she would have been willing to let him carry on with the operation of the property. He refused this proposal. She testified that before he carried out his threat to leave in July she attempted to dissuade him and suggested that she would be willing that they sell out their interests in the properties so that he could go elsewhere *385 and make a fresh start in life with her. In the depositions taken in this cause, he conceded that she may have made that proposal to him. The proof is overwhelming that the defendant did not, as plaintiff claims, have the fixed and overriding idea of wresting all of their property from him even by threat of assault and homicide, but that, on the contrary, her basic interest was in keeping the family together notwithstanding his shortcomings, and that it was only when she was convinced by plaintiff's desertion of her and his subsequent behavior that he did not intend to face his responsibilities to his family and his creditors that she decided that the best course would be for her to release him entirely, assume his financial obligations on her own and salvage what she could from the properties for the support of the family. It was solely for this purpose that she pressed him to convey his interests to her if he would not in any other way provide her and the children with support.
My conclusions as to plaintiff's motivation in agreeing to turn over the property are fortified by the fact that there was discussion at the settlement conference of October 5, 1953 concerning the divorce proceedings which the defendant would shortly institute. The understanding between the parties was that no claim for support of the defendant or the children would be made in those proceedings, in view of the agreement then being entered into. As a matter of fact, when, a month later, the defendant did file a complaint for divorce and prayed therein for support, plaintiff's attorney promptly phoned defendant's attorney and complained, and the latter apologized for the inadvertence and gave assurances that no support would in fact be requested in the proceedings, and this promise was kept. As indicated above, the divorce was eventually entered in favor of the plaintiff on a counterclaim, but no provision was made for support either of the wife or children.
The record of this case establishes overwhelmingly that plaintiff entered into the agreement of October 5, 1953 and made the conveyances on that date because he wished to be relieved of expenses, debts, and obligations which he felt *386 were a great burden upon him, and because relief therefrom was deemed by him to be well worth his turning over to the defendant all of his equities.
The so-called factory property in Farmingdale was lost by the defendant through mortgage foreclosure subsequent to the conveyance of his interest by the plaintiff. It obviously did not have much equity in October 1953. The Marlboro farm was encumbered by two mortgages aggregating $24,000, and there were business and personal obligations, many of them long standing and pressing, of between $20,000 and $25,000. Plaintiff testified in this case that the net worth of the parties on October 5, 1953 was $35,000; that their liabilities at that time were $45,000. Defendant's testimony was that their obligations approximated $60,000. While there is factual dispute as to some of the items, my conclusion is that the total indebtedness was nearer the estimate of defendant, who produced detailed records, than that of plaintiff.
Among plaintiff's other obligations was a note on which between $4,500 and $5,000 was due to Solomon Bolder, a brother of defendant. Bolder and the plaintiff had an understanding some time in September 1953 that if the conveyances here under attack were made Bolder would drop his claim against the plaintiff. After plaintiff instituted the present action Bolder sued him on the note and plaintiff filed an answer in that proceeding, setting forth as a defense that prior to the transfers complained of in the present action, Bolder promised and agreed with Rubenstein that if the latter "would transfer to the said Natalie Rubenstein, who was the sister of the plaintiff, the said property * * *, the said plaintiff [Bolder] would absolve and release this defendant of and from all liability whatsoever upon the promissory notes the subject of this suit; and relying upon the said promises * * * this defendant made the conveyances hereinabove referred to." In sworn answers to interrogatories in the same action, the present plaintiff said that he made the transfers involved in the present case "because of the duress practised upon him by Natalie Rubenstein *387 and also in reliance upon the promise of the plaintiff [i.e., of Bolder to release him from liability on the notes]."
Another of the many obligations which defendant took over under the agreement of October 5, 1953 was a note in favor of the Freehold Trust Company in the amount of $4,000, reduced to $3,700. In an action brought against him later by a sister and brother-in-law of the defendant as accommodation endorsers on the said obligation, plaintiff made an affidavit on August 16, 1954 in which he referred to the agreement with his wife involved in the present case, stating that she agreed therein to assume and pay off the Freehold Trust Company note "and as a part of the consideration for this promise, I conveyed to a corporation formed at her direction all my interest in a farm property at Marlboro, New Jersey, and all my interest in another parcel of real estate in Farmingdale, New Jersey" [the properties involved in the present case].
The closing of the transaction sought to be set aside herein took place October 5, 1953, as aforesaid, at the office of Harry Sagotsky, attorney for the defendant. Plaintiff was represented by his own counsel, Alvin Gelb. The deeds and the agreement were drawn at this meeting, the agreement having been dictated for the most part by Mr. Gelb. The first draft of the agreement was read aloud, and, amendments being suggested, it was redrawn before execution. In the discussion preceding the drafting of the instrument, all of the assets and liabilities of the parties were discussed and reviewed. The agreement recited as a preamble that the parties had had "marital difficulties and have been unable as a result thereof, to live together as husband and wife." In addition to the provisions already discussed, it was agreed that the plaintiff had the right to remove and retain title to three incubator machines, upon assuming a $2,600 note with the First National Bank of Farmingdale. All other obligations and indebtednesses of the parties were assumed by the defendant, and she undertook to save and hold the plaintiff harmless from any of such obligations. Gelb conceded, as a witness in the present cause, that at the conclusion *388 of the meeting, which occupied over three hours, he said to the plaintiff, "You got the better end of the deal," and that the plaintiff replied, "I know it."
After the conclusion of the transaction, the defendant borrowed $6,000 for the purpose of paying off debts. For the next few weeks, the plaintiff continued to come to the farm about twice a week. Defendant testified that she told him that she had listed the farm for sale, and he expressed no reaction. Thereafter she consulted with relatives and financial advisors and, on the basis thereof, decided to make the sale of 106 acres of the farm land hereinabove referred to for $23,000. She used the down payment of $2,300 in its entirety for the payment of debts and obligations. In order to make the sale she negotiated a release of the land sold in return for a reduction of the first mortgage to the extent of $9,000, and she made a similar arrangement with the second mortgagee for a reduction of the second mortgage by $1,500, which would have left mortgage encumbrances of $13,500 on the remaining portion of the property, including the buildings. There is no evidence in the case as to the fair market value of the remaining property. Plaintiff offered expert testimony of a valuation of $59,000 for that part of the property which was sold by the defendant. Cross-examination of the witness, however, reflected that his basis for estimating the depth of the more highly valued frontage was erroneous and his valuation conclusion was further impaired by his failure to consider the value of the property in its then existing use and condition and in assuming a value for housing development purposes which was speculative and of uncertain basis.
In summary of my conclusions upon the factual aspects of this controversy, I find and determine that the defendant at no time threatened the plaintiff with physical injury or death and that, in any event, plaintiff was not under any fear of death or physical injury on October 5, 1953, and no such fear played any causal part nor was an efficient cause in inducing his conveyances of the properties in question on that day. I further find that the pending prosecution of *389 the plaintiff for non-support and desertion instituted by the defendant against him on August 6, 1953 had no compulsive effect upon the plaintiff nor constituted an efficient cause of the conveyances; that the only significance of the desertion proceedings in the motivation of the plaintiff to transfer the property was that the plaintiff did strongly desire to be rid of his legal obligations as a husband and father to support his wife and children and that he realized that a failure to meet them would be followed by a continuation of that prosecution to a finality; in other words, that there was a criminal sanction for default in supporting his family and that he was willing to turn over his equity in the family real estate in order to purchase, among other things, immunity from legal enforcement of his obligations to his family. I further find that the only efficient cause of the conveyances sought herein to be avoided was plaintiff's desire to be relieved of all of his pressing pecuniary obligations and of his obligation to support his children and wife, he having decided that he wanted no more of the marriage and that the medical case of his older child was hopeless.
Independent legal considerations conduce to the same conclusion insofar as the prosecution for desertion and non-support is concerned. It has long been held in this jurisdiction that "`a demand made under the urgency of an intimation that if not complied with the law will be appealed to cannot reasonably be claimed to be either extortion or duress,'" and that rule is applicable even if the sanction of the criminal law is the basis of the intimation where there is in fact criminal liability. Mullin v. Leamy, 80 N.J.L. 484, 485 (Sup. Ct. 1911); Frost v. Frost, 42 N.J. Eq. 55 (Ch. 1886); cf. Bodine v. Morgan, 37 N.J. Eq. 426 (Ch. 1883); Travis v. Unkart, 89 N.J.L. 571, 573 (E. & A. 1916), where the result was otherwise because it was clear that the person claiming duress was not guilty of the offense in respect to which criminal prosecution was threatened. See also Manning v. Columbian Lodge, No. 117, I.O.O.F., 57 N.J. Eq. 338 (E. & A. 1897). In Ball v. Ward, 76 N.J. Eq. 8 (Ch. 1909), affirmed sub nom. Ball *390 v. Ball, 79 N.J. Eq. 170 (E. & A. 1911), there was set aside for duress a conveyance made by parents to a creditor under pressure of a threat to have the son criminally prosecuted. The creditor believed that the son had subjected himself to such prosecution, but the contrary was the fact. In affirming the judgment of rescission, the Court of Errors and Appeals left open the question of whether the vice-chancellor was right in intimating that the illegality of the agreement to stifle the prosecution could not furnish a ground for refusal of the court to relieve the victim of the duress. In Slater v. Gittleman, 104 N.J. Eq. 172 (E. & A. 1929), modifying 103 N.J. Eq. 98 (Ch. 1928), however, the Court of Errors and Appeals answered the problem posed in the Ball case, supra. It held that where in fact a crime had been committed and a creditor had procured the execution of a bond and mortgage as the price of an agreement not to prosecute, there resulted a compounding of a misdemeanor which was itself a misdemeanor, and that, in such circumstances, the court would leave the parties where it found them. The result was a modification of the decree granted in the Court of Chancery to the extent of vacating the cancellation of the bond and mortgage.
It is contended by the defendant that the principle of the Gittleman case is applicable here and that plaintiff is guilty of unclean hands in having purchased his immunity from prosecution for a misdemeanor by execution of the deeds he seeks to have set aside. It is not necessary for the court to determine whether the Gittleman case is apposite in the present connection, as I am satisfied that defendant's prosecution of plaintiff cannot properly be classified as wrongfully coercive action, entirely apart from the factual finding of lack of causal relationship stated above. It will be recalled that the defendant actually instituted the arrest proceedings in this case and did not in advance attempt to procure the conveyances by threat of institution thereof, aside from warning plaintiff that the law would not permit him to escape his obligation. The proceedings were, moreover, commenced by her after and upon advice by an attorney. *391 On the evidence adduced in this case, it cannot be said that there was not prima facie justification for her action. She was unquestionably deserted by the plaintiff, and it cannot be concluded that she was not in "destitute or necessitous circumstances," as required by the statute, N.J.S. 2A:100-2, merely because there was rental income of the property which she could use, where it was clear that it was necessary to apply such monies to maintenance and operating expenses of the property and to meet numerous other financial obligations which were pressing and which the plaintiff was ignoring. It was actually necessary for defendant to borrow several hundred dollars from her relatives in order to get by between July 22 and October 5, 1953. A husband cannot escape prosecution under the statute by putting his wife to her own efforts or the assistance of others. State on Complaint of Bruneel v. Bruneel, 14 N.J. 53, 61, 62 (1953). The "primary and ultimate objective" of the statute in question "is to secure an adequate support order, the criminal charge supplying coercive pressure to that end." State v. Savastini, 14 N.J. 507, 516 (1954); State v. Bruneel, supra (14 N.J., at page 59). Thus it is recognized that this kind of coercion by a wife is entirely within public policy. I am of the view that the invocation of this statute by a wife who has been deserted by her husband in circumstances fairly indicating its applicability and her subsequent stated intention to prosecute such proceedings to a conclusion if the husband does not either provide continuous support or make a property disposition in lieu thereof, do not constitute such "wrongful" or "oppressive" use of her remedy on the part of the wife as was described in the Rubenstein case, supra, as requisite to legal duress (20 N.J., at page 367).
These conclusions are abundantly justified on the facts here. The plaintiff had repeatedly threatened to leave defendant prior to July 1953. This was against her will and her importunities that he stay with her. Their child was put in an institution on July 13, 1953. Creditors were pressing them on all sides. Yet he left, July 20, 1953, without a word as to where he was going, without any provision *392 for sending her money or meeting their obligations, and casting all his responsibilities on her shoulders. He returned occasionally to annoy her in various ways and to haggle over the property, but never once giving her any support money or offering unconditionally to support her and the children, as was his obligation. Thus, whether approached from the standpoint of either the factual or legal tests of duress described by the Supreme Court in the Rubenstein case, supra, the desertion and non-support proceedings brought by the defendant against the plaintiff and their relationship to the transactions of October 5, 1953, furnish no basis for the avoidance thereof by the plaintiff on grounds of duress.
Judgment will be entered in favor of all of the defendants and against the plaintiff.