BERNARD MILLER, PLAINTIFF-APPELLANT, v. JOHN L. EISELE, FREDERICK EISELE, EDWARD A. EISELE, NATHANIEL KING AND ARCHIBALD GOLD, CO-PARTNERS, TRADING AS EISELE & KING, DEFENDANTS-RESPONDENTS.

Submitted May 26, 1933—Decided September 27, 1933.

For the appellant, *Schotland & Schotland*.

For the respondents, *Lum, Tamblyn & Colyer*.

The opinion of the court was delivered by

PERSKIE, J. This appeal brings up for review a judgment on nonsuit granted by the court below. The evidence presented at the conclusion of the plaintiff-appellant's case disclosed the following situation: The plaintiff-appellant (a customer), who, for sake of brevity, shall hereafter be referred to as Miller, brought suit against the defendants-respondents, who shall, also for sake of brevity, be hereafter referred to as brokers, for moneys alleged to be due him from the brokers. The suit was based on two counts. The first count was for the sum of $15,527.40, which, in substance, Miller (customer) claimed was improperly charged to his account because he was in nowise liable therefor, and which he paid, under protest, and without prejudice, as a result of being threatened that unless he paid the sum of $40,050.52 (the item of $15,527.40 being a part thereof) the brokers would sell his stock on the open market and apply the proceeds thereof toward the liquidation of his alleged indebtedness to them. The second count was for the sum of $54,251.28 and was based, in substance, on the claim that the brokers by reason of an unauthorized sale and conversion of one-half of his securities on November 13th, 1929, in order to satisfy an unanswered demand for additional margin, which demand, it is alleged, would have been unnecessary had the brokers not improperly charged his account with this item of $15,527.40.

Miller had been a customer of the brokers for some time prior to 1928. William Lehman was what is termed in the stock brokerage business, as a confidential or customer's man, and was employed by the brokers. On September 19th, 1928, Miller and Lehman entered into a partnership arrangement, in writing, to deal in stock, excepting a few stocks which were

not included and which belonged to Miller, personally. The former agreeing to supply the funds and the latter the experience. As a matter of fact they had some dealings under the same terms beginning with June, 1928. On September 6th, 1928, they divided some of their profits. Miller testified that the brokers knew of his arrangements with their Mr. Lehman. He told them so on two occasions, once to their Mr. Gold and once to their Mr. King, both members of the brokerage firm. The account under which Miller and Lehman operated with the brokers, under the arrangements above set forth, was designated as account No. 366. This arrangement continued up and until July 12th, 1929. Miller, desiring to go to Europe, says that he insisted upon a dissolution of his arrangement with Lehman. He so advised Mr. Gold. The latter told him to go to see Bill—meaning Lehman—and he did so, and said to him: "I intend to go abroad, and before I leave I would like to wind up my affairs because if anything happens to me abroad I don't want my family to be tangled up in the stock market." Whereupon Miller and Lehman went to the bookkeeping department of the brokers and straightened out their account. As a result of a request for a writing to verify this adjustment Lehman gave Miller the following writing:

"(Letterhead)
EISELE & KING
UNION BUILDING
Clinton Street
Newark, N. J.

July 12/29.

Dear Barney:

I understand you are leaving for Europe Monday. Let it be understood that all securities namely 144 Con. Gas 230 Texas Corp. $6,000 in cash 300 Houston and 200 Lambert are held in your account.

In the event that we sell 300 HO and 200 Lambert the profit or loss assuming in to be divided equally between you and myself. I have no interest in your holding 144 Con. Gas 230 Texas Corp. or 6,000 cash.

I am responsible for interest charges on HO and Lambert 50% and also interest in dividends 5% of Lambert. I will take care of note held at Vailsburg Trust Co. to the amount of $4,000 which you are 50% responsible to me.

Bon voyage.

Yours,

WM. L. LEHMAN."

On July 16th, 1929, Miller sailed for Europe. On or about July 18th, 1929, William Lehman opened a new account with the brokers, under the name of "Barney Miller, Special, Acct. No. 1053" and the said Lehman continued to trade thereunder until October 23d, 1929. There was no trading during the interval between July and October, 1929, under the account No. 366. Miller denied the right on the part of Lehman to open this special account No. 1053, or to trade thereunder for his benefit. Miller returned from Europe in September, 1929. He received a call for margin. He called on the brokers for an explanation, saying that since he had not himself done any trading on this account, or as he claimed, authorized anyone to do so, he could not understand the reason for the call for additional margin. He was told his account was short. He asked leave to have his personal accountant go over this account. This was granted. Thus his accountant, Mr. Victor Beckreck, audited his account and it was ascertained that there had been transferred to his account No. 366, a debt arising in special account No. 1053, in the sum of $15,527.40. Lehman admitted that the latter item was his and was not chargeable to Miller. Despite this Miller was told that he would either put up additional margin or he would be sold out. He put up some additional collateral and caused an account with a broker, Ira Haupt, to be transferred over to the brokers-respondents—as a result of which they received $4,000 above. what they paid for it on the transfer. The market kept going down and shortly thereafter, October 30th, 1929, and on November 12th, 1929, more margin was demanded and because of his inability to supply same, one-half of all his

holdings, with the exception of forty shares of one stock, were sold on November 13th, 1929, resulting in an alleged loss to him in the sum of $54,251.88. This despite the protests of Miller and his threat that he would hold the brokers accountable for any loss that might result by reason of the sale of these securities. The evidence of Miller's accountant tended to justify the conclusion that if the item of $15,527.40 had not been included in account No. 366, there might probably have been no necessity for the sale of the securities.

Miller's debit balance on November 13th, 1929, was $86,325.74 and the market value of the securities as of the same day was $108,645. If we add $15,527.40 to the debit balance there is still left $6,791.82. On December 21st, 1929, Miller closed out his acount by paying the brokers the sum of $43,050.54, under protest, and without prejudice, in order, as he says, to obtain the return of his collateral.

At this posture of the case a motion for a nonsuit was made and allowed. We think that this was error. The court has held: "That it is entirely settled that the motion to nonsuit admits the truth of the plaintiff's evidence and of every inference of fact that can be legitimately drawn therefrom, but denies its sufficiency in law; and where the evidence and the inferences reasonably arising therefrom will support a finding for the plaintiff, the motion for nonsuit is properly denied." *Goodyear Tire Co.* v. *Gallagher,* 108 *N. J. L.* 543. In the case of *Finnegan* v. *The Goerke Co.,* 106 *Id.* 59, the late Chancellor Walker, relying on the case of *Bennett* v. *Busch,* 72 *Id.* 240, held:

"* * * where fair-minded men might honestly differ as to the conclusions to be drawn from facts whether controverted or uncontroverted, the question at issue should go to the jury * * *," although the opinion of the judge upon the evidence might be otherwise.

We are of the opinion that the following are some of the questions of fact which presented themselves at the conclusion of the case. (a) Did the brokers know of the arrangements existing between Miller and Lehman? (b) Did Leh-

man have Miller's authority to open the "Barney Miller Special Account No. 1053?" (c) Did the brokers have actual or constructive notice of the dissolution of the arrangements between Miller and Lehman before Miller sailed for Europe? (Agency is a question for the jury where there is a factual dispute. *Feist & Feist, Inc.,* v. *Spilzer,* 107 *Id.* 138.) Fair-minded men might honestly differ as to the conclusion to be drawn from these facts. These questions were factual and should have been submitted to the jury.

But it is contended, *in limine,* that Miller's payment of the $43,050.54, including the item of $15,527.40, on December 21st, 1929, was a voluntary payment and therefore he is barred from any recovery. He accompanied the payment with the following writing:

"Bernard Miller
71 Treacy Avenue
Newark N. J.
December 21, 1929.

Eisele & King,
Union Building,
Newark, N. J.
My Dear Sirs:

I am herewith handing you $43,050.54, which is the amount, according to your books, which I owe you on account of the stock which is in your possession and I demand delivery of the stock to me.

In making this payment I do not agree that the amount, which, according to your books, is owing by me is the actual amount owing by me. In the first place, I claim that you had no right to charge to my account the balance supposed to be due on a special account which was opened in my name with you by your representative without my authority, which account aggregated some $15,000.

I also claim that by reason of the inclusion of this balance in my account you called upon me for margin when my account was properly margined and that you sold securities of mine which you would have no right to sell, assuming that the $15,000 was not properly charged to my account, and

which sale resulted in loss to me for which I propose to hold you responsible.

I am making this payment at this time because you will not release these securities without the payment being made and I am forced to do it to protect my securities.

Very truly yours

Bernard Miller."

That money voluntarily paid with full knowledge of all the facts and circumstances in the absence of fraud, cannot be recovered back is the well settled law. But was the payment by Miller under all the facts and circumstances a voluntary payment in contemplation of law or was it made under duress? To give answer to this query we must first determine what is duress. In the Restatement of the Law of Contracts (11 *American Institute*, 1932, *p.* 938, § 492) it is defined as follows:

"Duress in the restatement of this subject means (a) any wrongful act of one person that compels a manifestation of apparent assent by another to a transaction without his volition, or (b) any wrongful threat of one person by words or other conduct that induces another to enter into a transaction under the influence of such fear as precludes him from exercising free will and judgment, if the threat was intended or should reasonably have been expected to operate as in inducement."

In commenting on the foregoing section (comment (a), page 939), the authors say:

"The test of what act or threat produces the required degree of fear is not objective. The threat need not be such as would put a brave man, or even a man of ordinary firmness, in fear. The question is rather, did it put one entering into the transaction in such fear as to preclude the exercise by him of free will and judgment."

This definition of duress leads us to the next inquiry—what constitutes a "wrongful act?" Thus the same authors in comment (g), page 941, say:

"Acts or threats cannot constitute duress unless they are

wrongful, even though they exert such pressure as to preclude the exercise of free judgment. But acts may be wrongful within the meaning of this rule though they are not criminal or tortious or in violation of a contractual duty. Just as acts contracted for may be against public policy and the contract vitiated for that reason, though the law imposes no penalty for doing them, so acts that involve abuse of legal remedies or that are wrongful in a moral sense, if made use of as a means of causing fear vitiate a transaction induced by that fear, though they may not in themselves be legal wrongs."

The person of the plaintiff, as it is often said, was under no duress but his property, his stock, and all evidence of title thereto, was in possession and control of the brokers. Duress may be either of the person or of his property. In 21 *R. C. L.*, *p.* 147, § 171, the rule of law is stated as follows:

"The rule of the early common law was that a payment is not to be regarded as compulsory unless made to emancipate the person or property from an actual and existing duress imposed on it by the one to whom the money is paid, or to prevent a seizure by a person having apparent authority to that end. The rule of the common law worked hardship and injustice in many instances, and this ancient doctrine of duress of person, and later of goods, has been much relaxed through the influence of equity, and extended so as to admit of compulsion of business and circumstances. Money paid under practical compulsion has in many cases been allowed to be recovered, as, for example, payment made to obtain goods wrongfully detained; excessive fees when taken under color of office; excessive charges collected for performance of a duty, &c. In all such cases there was a moral coercion which destroyed the contract."

In the case of *Adrico Realty Corp.* v. *City of New York*, 250 *N. Y.* 29; 164 *N. E. Rep.* 732; 64 *A. L. R.* (1928) 1, the court held:

"This rule of voluntary payment is dependent upon what is considered voluntary and what duress, also upon what is mistake of law, as distinguished from a mistake of fact, and

the determination of these questions varies the application of the rule  When we speak of duress in this connection, it does not necessarily mean personal fear or the use of force, but rather that pressure of circumstances which compels the will of man to yield to an exaction or a payment to release his property from some illegal hold upon it.  Thus, paying unlawful freight charges to get personal property has been held to be involuntary.  *Harmony* v. *Bingham,* 12 *N. Y.* 99; 62 *Am. Dec.* 142, and cases then reviewed.  Money paid 'through necessity and urgency of the case' was held not to be a voluntary payment.

"The expression which runs through the cases is that duress exists when the payment of money becomes necessary to obtain the immediate liberty of person or the possession of property.  *Tripler* v. *City of New York,* 125 *N. Y.* 617; 26 *N. E. Rep.* 721."

In the case of *Chicago* v. *Northwestern Mutual Life Insurance Co.,* 218 *Ill.* 40; 1 *L. R. A.* (*N. S.*) 770, the court considered a threat of turning off the water supply unless an excessive charge was paid, and held:

"It is the well settled rule of this state that, where one is compelled to make payment of money which the party demanding has no legal right to receive, in order to prevent injury to his person, business or property, such payment in law is made under duress, and may be recovered from the party receiving it; and it makes no difference that the payment was made with the full knowledge of all the facts, provided it was made under duress."

In the case of *Walz* v. *Muir,* 218 *N. Y. Supp.* 529; 218 *App. Div.* (1926) 495, the court held:

"The defendants held plaintiff's securities as collateral and refused to correct their excess charges.  Plaintiff, in consequence of his refusal, was compelled to pay these excess charges in order to get back his property.  In *Clancy* v. *Dutton,* 129 *App. Div.* 23, 25; 113 *N. Y. Supp.* 124, 126, the Appellate Division, Second Department, said:

" 'To constitute a voluntary payment the party paying must have had the freedom of exercising his will.  When he

acts under any species of compulsion, the payment is not voluntary and if a party has in his possession property belonging to another and refused to deliver such property to that other unless the latter pays him a sum of money which he had no right to receive, and in order to obtain possession of his property the owner pays that sum, the money so paid is a payment made by compulsion and may be recovered back.' * * *

"A party nonsuited, or against whom a verdict is directed, is entitled on review to the most favorable inference deducible from the evidence, and all contested facts are to be treated as established in his favor."

In the case of *Lowenstein* v. *Bache*, 41 *Pa. Sup. Ct.* 552, the court held:

"The general rule may be stated thus: When a party is compelled by duress of his person, deeds, papers or personal property, and the evidence of title thereto to pay money illegally demanded from which the party making the payment has no other means of immediate and adequate relief, it is not voluntary but compulsory and he may rescue himself from such duress by payment of the money under protest and afterwards on proof of the fact recover it back. *Hospital* v. *Philadelphia Cy.*, 24 *Pa.* 229; *White* v. *Heylman*, 34 *Id.* 142; *Motz* v. *Mitchell*, 91 *Id.* 114; *Lehigh* v. *Brown*, 100 *Id.* 335; *Union* v. *Alleghany*, 101 *Id.* 250; *Shaw* v. *Alleghany*, 115 *Id.* 46; *Railroad Co.* v. *Commissioners*, 98 *U. S.* 541. * * *.

"The relief to which he was entitled was the immediate possession of his property upon payment of the amount for which it was pledged. He was compelled to pay to the defendants $832.84 more than they were lawfully entitled to claim from him in order to obtain possession of his property which they held as a pledge, and he had no other means of immediate adequate relief; he paid under protest notifying them that he would bring an action to recover it back. We are constrained by the weight of athority to hold that this was an involuntary payment and that plaintiff is entitled to recover. * * *.

"It has been argued in the present case that the plaintiff, after tendering the amount which he admitted to be due, had a remedy in an action of trover against the defendants, that he might have recovered the value of his securities; that he was put to his election between this cause and voluntary paying the money and that, having paid the money, he cannot recover. An action of trover would not have afforded the plaintiff relief to which he was entitled, the immediate possession of his property; he would have been compelled to exchange his property for a right of action against these defendants."

In *Charhill Pet Co.* v. *Ennis Bayard Co.*, 81 *Pa. Sup. Ct.* 486, involved an action of *assumpsit* for the amount of a draft paid under protest. It appeared that the plaintiff had sold the defendant a certain shipment of wax which was rejected. On request to return the bill of lading the defendant did so but attached thereto a sight draft for which it claimed to be the damage sustained as a result of the plaintiff not sending the kind of wax purchased. In order to regain the shipment and prevent further loss the plaintiff paid the draft, took the wax and sold it. Subsequently an action was brought to recover the loss resulting from the wrongful refusal to accept and pay for the wax by the defendant. It was held in this case that the payment of the draft was involuntary and a verdict for the plaintiff was sustained. The court held that:

"Plaintiff could not get the bill of lading without paying the draft and in order to obtain the property paid the draft and gave notice to the bank of protest."

The court in this case further held:

"Where a person is compelled by duress of his person or goods or the evidence of title thereto, to pay money for which he is not liable, and from which he has no immediate or adequate relief, it is not voluntary but compulsory and he may rescue himself from such distress by payment of the money under protest and afterwards on proof of the fact recover it back."

In our state in the case of *Berger* v. *Bonnell Motor Car Co.*, 4 *N. J. Mis. R.* 589; 133 *Atl. Rep.* 778, the court held:

"The plaintiff alleged that the defendant agreed to repair

plaintiff's automobile for $64 and that, after making the repairs, the defendant refused to surrender the car to the plaintiff, unless upon payment of $108.25, which sum included $83.23 for repairs and $25 for legal fees. The plaintiff paid the amount demanded, under protest, however, and brought this action to recover the amount paid in excess of the contract price.

"The defendant's contentions are that the payment by the plaintiff was voluntary, and that plaintiff had an adequate remedy at law, and hence there was neither duress nor extortion, and that therefore plaintiff could not recover. The rule is settled otherwise. It has been declared quite generally that:

" 'Money paid by one to get possession of his property held by another claiming a lien on the same may be recovered where the lien claim is without merit.' *Ann. Cas.* 1913 *A,* 1356.

"In pursuance of that rule, it has been held that: 'Money paid to a common carrier to obtain possession of one's goods, beyond the amount to which the carrier is entitled, may be recovered." *E. D. Clough* v. *Boston and Maine Railroad,* 77 *N. H.* 222; 90 *Atl. Rep.* 863; *Ann. Cas.* 1915 B, 1195.

"The judgment will be affirmed."

The instant case is unlike the type of cases of which *Shoemaker* v. *Board of Health,* 83 *N. J. L.* 425; *McCrory Stores Corp.* v. *Braunstein,* 99 *Id.* 166; *Whitall-Tatum Co.* v. *Vineland,* 102 *Id.* 28, and their prototype, are typical. In these cases it will be found that the payments were held to be voluntary in each instance, chiefly because they were made notwithstanding the fact that a complete and adequate remedy to test or resist the payment exacted was provided under the law without loss, injury or harm to the *res* involved. The plaintiff in the case at bar had no such adequate relief to obtain the immediate return of his securities.

In the case of *Koewing* v. *West Orange,* 89 *N. J. L.* 539 (at *p.* 542); 99 *Atl. Rep.* 203, the late Chancellor Walker held:

"In 30 *Cyc.* 1310, it is stated that a payment is not ren-

dered involuntary merely because the payor at the time makes a protest against the payment and that if money is paid under compulsion no protest is necessary to lay the foundation of an action to recover it, but if there be doubt as to whether the payment was voluntary, the protest may be taken into account in determining that question. This is clearly the law."

In 48 *C. J.*, *p.* 772, § 339, there appears the following:

"Thus it is for the jury to determine whether the evidence is conflicting whether payment was made under duress, was voluntary or involuntary."

We are constrained by the weight of authority to adopt the view which holds that to constitute duress which in contemplation of the law will recognize as sufficient to make or render a payment of money involuntary there must be some actual or threatened exercise of power possessed, or supposed to be possessed, by the party exacting payment, from which the party making the payment has no other means of immediate and adequate relief of his person or of his property.

Was the method employed by Miller sufficient under all the facts and circumstances to disprove that his was a free and willing mind when he made the payment in order to obtain the immediate return of his securities? We think this was a jury question. The brokers stood firm. They insisted that the item of $15,527.40 was a proper charge against his account. The stock market prices kept going downward. What ordinary reasonable or prudent person, under like circumstances, would not have been put in fear as to the ultimate outcome of such a person's securities? Miller was not called upon to speculate as to the outcome. He knew by experience that despite protest and threats to hold the brokers responsible his unanswered call for additional margin resulted in a sale of one-half of his securities on November 13th, 1929. It is merely restating a truism to now say that the stock market crash of 1929 left behind it a trail of great financial distress. Many a person, and business institutions, were forced into bankruptcy. It is particularly unconvincing in light of developments since

1929, such as the further decline of the stock market, the continued recession of the economic depression, to say that Miller should have stood by, permitted the sale of his securities, and rely on his questionable remedy against the brokers. Or in other words, he should have permitted the exchange of his securities for what might well have turned out to be a barren remedy. Time alone has since proven that his fears were those not only of a reasonable man but those of a wise man.

The case was clearly one for the jury to determine, and therefore the judgment of nonsuit is reversed.

*For affirmance*—None.

*For reversal*—THE CHANCELLOR, CHIEF JUSTICE, TRENCHARD, PARKER, CASE, BODINE, DONGES, HEHER, PERSKIE, VAN BUSKIRK, KAYS, HETFIELD, DEAR, WELLS, DILL, JJ. 15.