44 N.J. Super. 565 (1957)
131 A.2d 306
S.P. DUNHAM & COMPANY, A NEW JERSEY CORPORATION, PLAINTIFF-RESPONDENT,
v.
GEORGE M. KUDRA, T/A KUDRA FURS, AND THE HOUSE OF KUDRA FURS, A NEW JERSEY CORPORATION, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued April 1, 1957.
Decided April 16, 1957.
*568 Before Judges CLAPP, JAYNE and FRANCIS.
Mr. Philip J. Albert argued the cause for plaintiff-respondent (Messrs. Levy and Levy, attorneys).
Mr. Purvis Brearley argued the cause for defendants-appellants.
The opinion of the court was delivered by CLAPP, S.J.A.D.
Plaintiff, S.P. Dunham & Company, sued defendants for the restitution of $3,232.55 paid them allegedly under business compulsion. The trial court, sitting without a jury, gave judgment for the plaintiff in the amount stated. Defendants appeal.
Plaintiff has for over a century operated a department store in Trenton. For some three years it had leased its fur department to a concessionaire, Elmer A. Hurwitz & Co., but the business of the department was so conducted as to appear to customers to have been a part of plaintiff's operations. During these three years fur coats, left by customers with Hurwitz for storage and cleaning, were turned over by him to the defendants Kudra who stored and cleaned them pursuant to an agreement with Hurwitz. Plaintiff knew something of Hurwitz' arrangement with Kudra.
*569 In November 1955 Hurwitz went bankrupt and Dunham thereupon cancelled his concession. However, winter was coming on, and Dunham's customers wanted their coats. On November 23, 1955 Kudra had possession of 412 garments, on which Hurwitz owed Kudra $622.50. This sum plaintiff offered to pay Kudra in return for the garments. But Hurwitz owed Kudra an additional $3,232.55 with respect to other garments that had been delivered back to customers during the preceding two years; and on November 23, Kudra announced that the 412 coats would not be turned over unless plaintiff paid the total sum of $3,855.05. One of the owners of Dunham, much upset, asked Kudra for a few days to think the matter over and consult with counsel. Apparently at about that time, the temperature had dropped to 15° many substantial customers of the store demanded their coats. When both owners of Dunham then sought to negotiate further, Kudra came up with the proposition that it would deliver the garments directly to plaintiff's customers without charge to the plaintiff, if plaintiff would turn over their names; not only would plaintiff thus place the names of customers in the hands of a competitor in the fur business, but Kudra apparently purposed to bill them directly for Hurwitz' total charges on the coats, which totalled some $4,000. Plaintiff flatly rejected this proposition and on November 29 yielded to Kudra's original demand, paying the $3,855.05. Allegedly, three days later it sought the return of $3,232.55 and on December 15 commenced this action.
Plaintiff seeks the restitution of the $3,232.55 on the ground that the money was paid to defendants, not voluntarily, but under a species of duress, sometimes known as "business compulsion." It claims that defendants, taking advantage of its plight, sought to squeeze it between their own improper demands and the complaints of its customers. Indeed, the predicament in which it was placed was so embarrassing a matter that one of the owners of the store, apprehensive of a serious impairment in its good will, himself spent hours in the fur department talking to customers. *570 There is little doubt but that the pressure which defendants brought to bear upon the plaintiff was an inducing (Restatement, Contracts, § 492f), indeed the sole cause of its payment of the $3,232.55.
A slight examination of the subject will demonstrate that the law of duress is in the process of development. 5 Williston, Contracts (rev. ed. 1937), § 1603; Dawson, "Economic Duress  An Essay in Perspective," 45 Mich. L. Rev. 253 (1947); Dalzell, "Duress by Economic Pressure," 20 No. Car. L. Rev. 237, 341 (1942). Thus in New Jersey, after some conflicting decisions on the point, our courts have finally rejected the objective test, namely, that duress is irremediable unless it is of such severity as to overcome the will of a person of ordinary firmness; the test now is simply this  has the person complaining been constrained to do what he otherwise would not have done? Rubenstein v. Rubenstein, 20 N.J. 359, 366 (1956); Miller v. Eisele, 111 N.J.L. 268, 275 (E. & A. 1933), a case of business compulsion; but see King v. Margolis, 133 N.J. Eq. 61 (Ch. 1943), affirmed at 617 (E. & A. 1943); Hochman v. Zigler's Inc., 139 N.J. Eq. 139 (Ch. 1946); Talbott, "Contracts," 11 Rutgers L. Rev. 238, 243 (1956).
Apropos of this, attention may be directed to a point brought up by the respondent. It has repeatedly been held in our cases that a person cannot claim to have made a payment under duress if, before he made the payment, there was available to him an immediate and adequate remedy in the courts to test or resist it. Among the recent cases are Miller v. Eisele, 111 N.J.L. 268, 280 (E. & A. 1933), and cases cited; Sutton v. Metropolitan Casualty Ins. Co., N.Y., 117 N.J.L. 21 (Sup. Ct. 1936); Meier v. Nightingale, 134 N.J.L. 275 (E. & A. 1946). This harsh rule has been rejected by the Restatement, Contracts, § 493, Illustrations 8, 9, and also by Williston. Williston points out that
"the only reason which could be given for such a rule is that a threat of this sort should not terrify a person of" ordinary firmness. "But, though such statements are still repeated, the rule is artificial and, so far as it would require a person threatened with *571 injury necessarily to endure the injury because the law provides a remedy for it, cannot be accepted." § 1620, at p. 4529.
See further Williston, supra, § 1620; cf. Dalzell, supra, 380. Now that New Jersey in Rubenstein v. Rubenstein, 20 N.J. 359, 366 (1956), supra, has definitely repudiated the standard of "ordinary firmness," there may be little reason to retain the other rule; the criterion perhaps should be solely whether the will of the victim was really overborne. An attempt has been made to justify the rule stated, upon the ground that the person exerting the duress has relied on the payment made to him by the victim, and having relied, he should be protected. Dalzell, supra, 368. But why should the law have such a tender regard for a wrongdoer? Relief by way of restitution puts no undue burden upon him; he is not subjected to damages for his wrong, but merely called upon to give back that which he forced from his victim. The court granting restitution should have an easy conscience in the matter.
However, we need not pass upon this more fundamental question. If we accept the rule as stated in our cases, we must still ask ourselves whether the plaintiff had a "complete and adequate remedy" (Miller v. Eisele, 111 N.J.L. 268, 280 (E. & A. 1933)) enabling it to recover the coats for its customers and avoid the payment of the $3,232.55. Or did it have merely a "questionable" (Miller v. Eisele, supra, 111 N.J.L., at 282), or uncertain (Dalzell, supra, at 371; Williston, supra, § 1620) remedy? Redress by way of replevin was suggested on the oral argument. But plaintiff, by way of reply, said first that it was questionable whether it had the standing to maintain an action of replevin, since the owners of the coats had delivered them to Hurwitz and Hurwitz in turn had handed them over to defendants pursuant to his agreement with them; in fact defendants say in their brief that "Dunham had no control over the return of these coats by Kudra." We pass the question as to whether plaintiff had the standing to maintain the action. And we may also pass the second question raised by plaintiff *572 in that regard, namely, whether the remedy in replevin was entirely adequate in view of Kudra's right to prevent the delivery of the goods by putting up a redelivery bond. N.J.S. 2A:59-6. It might be said in this latter connection that the action on such a bond
"`would not have afforded the plaintiff the relief to which he was entitled, the immediate possession of his property; he would have been compelled to exchange [the] property for a right of action against these defendants'" on the redelivery bond. Cf. Miller v. Eisele, supra, 111 N.J.L. at 279.
But see Meier v. Nightingale, 134 N.J.L. 275 (E. & A. 1946). Passing those two questions, we come to plaintiff's third contention, namely, that there was no adequate remedy here through any form of litigation. Plaintiff, faced with the clamoring demands of its customers, plainly did not want it brought home to each of them at that juncture that its competitors, the defendants, were in fact attending to the storing and cleaning of her coat. We think a public suit at that time did not constitute adequate relief.
We turn now to defendants' principal argument, which seems to be that they should not be chargeable by plaintiff with "the duress * * * it itself had long ago prepared." They rely on the fact that plaintiff for three years during the summer months had lent Hurwitz money "in the neighborhood of $2,000, $1,500"; and they claim that, though these amounts were paid back in September each year, plaintiff should have known of Hurwitz' financial difficulties. The argument seems to be that plaintiff itself caused defendants to exert the duress. The point is without the slightest substance.
Next, defendants seem to argue, referring to the early common-law doctrine of "duress of goods," that under our present concepts of "business compulsion" redress could be had by the plaintiff here only if it had been compelled to pay out money in order to recover its own property. There is nothing to this point either. The law today does not take such a narrow view of the matter, if indeed it ever did.
*573 Further, defendants contend that the plaintiff cannot have been under duress since, for six days, it had an opportunity to deliberate and consult with its own counsel. These are matters which should be taken into account in determining whether in fact the plaintiff made the payment voluntarily and whether the pressure of defendants' demands still subsisted after deliberation and consultation; but they do not of themselves preclude relief. Restatement, Contracts, § 492, comment c.
Again it is urged that one person (Dunham) cannot claim to have been placed under duress if he pays money to the defendants for the relief of another person (i.e., its customers). We need not refer to the law on the subject, cf. Williston, supra, § 1621, because it is apparent that Dunham paid the $3,232.55 for the relief of itself from an injury to its own good will.
Defendants also say that the statutes gave them a processor's lien, entitling them to hold the coats "for the entire indebtedness" of Hurwitz. N.J.S. 2A:44-157, 2A:44-158. But the services performed here are not within the contemplation of this legislation. As stated in the statute (N.J.S. 2A:44-157):
"`Processor' means a person, partnership or corporation engaged in the business of spinning, throwing, manufacturing, bleaching, mercerizing, dyeing, weighting, printing, finishing, dressing, scraping or otherwise treating or processing of linen, cotton, wool, silk, artificial silk, yarns or goods, skins, pelts, furs or hides, or goods of which linen, cotton, wool, silk, artificial silk, skins, pelts, furs or hides form a component part."
Pursuant to the agreement between Hurwitz and defendants, some coats were glazed  that is, shampooed  and some were cleaned. It is said also that some coats were repaired; however it appears that repairing was not authorized by the customers, and only undertaken by defendants, without charge, when they thought they had damaged a coat while cleaning it. So the authorized processing here consisted merely of the cleaning and shampooing of some coats. This is not a bleaching or a dressing of the goods. Nor are the *574 services rendered here sufficiently similar to any of the operations referred to in the statute as to fall within the phrase "otherwise treating or processing." Cf. Stone v. Allied Clothing Corp., 140 N.J. Eq. 224, 232 (Ch. 1947); Newark Slip Cont. Co. v. New York Credit Men's Adj. B., 186 F.2d 152, 154 (2 Cir. 1951). Noscitur a sociis. We need not stop to consider whether the statute is to be construed strictly or liberally. 53 C.J.S., Liens, § 5.
There was therefore no processor's lien. In a portion of one sentence of the brief, defendants contend they had also a "general lien" on the 412 coats, as security for the $3,232.55, upon the ground that defendants "always" had on hand some unclaimed garments. The allusion is to a common-law artisan's lien. Restatement, Security, § 61; Agnew v. American Ice Co., 2 N.J. 291, 300 (1949); Lanterman v. Luby, 96 N.J.L. 255, 257, 258 (E. & A. 1921). And the theory of the point is that where a bailee, holding such a lien for a certain amount on several chattels, surrenders part of them, he may under some circumstances retain the remaining chattels until the entire amount is paid. Restatement, Security, § 80(2); but cf. Brown, Personal Property (2d ed.), 525. We need not pass upon the point. Assuming that the nature of the services rendered was such as to give rise to a lien of this sort (White v. Smith, 44 N.J.L. 105, 109 (Sup. Ct. 1882); Brown, supra, 516; cf. Restatement, Security, § 61, comment d), it nevertheless appears that there is no factual basis for the point. There is nothing to show that any one or more of the 412 garments on hand on November 23, 1955 had been in the defendants' possession at the time Hurwitz became obligated for any of the sums making up the $3,232.55. We therefore need not pursue the matter further.
It may be observed that on November 23, 1955 defendants claimed a common-law lien (but not a processor's lien  the trial court said that defendants did not rely upon the latter lien until after this suit had been instituted). However, this does not matter. No one raises any question as to whether defendants were then acting in good faith and as *575 to whether good faith on their part at that time would have precluded recovery by the plaintiff. Cf. Williston, supra, § 1606; Restatement, Contracts, § 492g, quoted in Miller v. Eisele, 111 N.J.L. 268, 275 (E. & A. 1933); Dalzell, supra, at 565, 566. We therefore need not pass on the question, but we might refer to the trial court's concluding remarks below: "it [defendants' conduct] is one of the things I prefer not to * * * have to live with in the community. I couldn't justify it."
Defendants also seek a modification of the judgment because of some, apparently a small, credit to which, they allege, they are entitled. They made no claim for such a credit before the trial court, and the proofs on the point are so inadequate that it is not clear whether in fact a credit is due or, if due, how much it amounts to. We see no warrant for sending the case back for a new trial on this point which was plainly overlooked by defendants below.
Finally, they contend there should be a new trial because of the trial court's rulings as to the admission of certain evidence and because of its general conduct of the cause. We see no merit in any of these contentions.
Affirmed.