51 N.J. Super. 331 (1958)
143 A.2d 885
NICHOLAS P. FREGA AND SUSAN FREGA, HIS WIFE, PLAINTIFFS-APPELLANTS,
v.
NORTHERN NEW JERSEY MORTGAGE ASSOCIATION, A NEW JERSEY CORPORATION, AND LAWYERS MORTGAGE AND TITLE COMPANY, A NEW YORK CORPORATION AUTHORIZED TO DO BUSINESS IN THE STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued June 23, 1958.
Decided July 22, 1958.
*333 Before Judges STANTON, HALL and GAULKIN.
Mr. Thomas M. Maher argued the cause for plaintiffs-appellants.
Mr. Elias D. Haut argued the cause for defendants-respondents.
The opinion of the court was delivered by GAULKIN, J.A.D.
Plaintiffs sued in two counts. The case was tried with a jury. After plaintiffs rested, the trial court granted defendant's motion for judgment of dismissal of the second count. The defendants then rested without offering any testimony, even against the first count. The trial judge thereupon directed a verdict in plaintiffs' favor on the first count for $250. Plaintiffs appeal from the dismissal of the second count.
The court below dismissed the second count because in his opinion the proofs, at the end of plaintiffs' case, had not made out a cause of action. Therefore, to determine whether the trial court erred we must, in the light of the pleadings, examine the proofs as they stood at the time of the granting of the motion, bearing in mind that upon such a motion the court must accept the plaintiffs' proofs and view them in their most favorable light, giving the plaintiffs the benefit of every legitimate inference that may be drawn therefrom. Melone v. Jersey Central Power & Light Co., 18 N.J. 163, 170 (1957). So viewed, we find that when plaintiffs rested, the proofs were as follows: Plaintiffs had *334 decided to have a house constructed for them by Lance-Smith Corporation, a developer. They needed financing for most of the cost. Lance-Smith introduced them to Northern New Jersey Mortgage Associates (hereafter called Northern). On October 16, 1956, Northern wrote plaintiffs that it had arranged for them a
"Construction loan in the amount of $7,500 for 6 mos. at 6% interest for time and amount used plus 2% service charge.
Permanent conventional loan in the amount of $11,500 for a period of 20 years at 5 1/2% int. The cost to you for the permanent loan will be 2% of the face amount of said loan.
It is understood and agreed that the closing will be handled under the auspices of Northern New Jersey Abstract Company.
Expiration date of this commitment will be April 16th, 1957 unless extended at our option."
Plaintiffs then signed and acknowledged a paper prepared by Northern which provided, among other things not here pertinent, that "It is understood and agreed that in the event said financing is arranged by a source other than Associates, in violation of this Agreement, such premises shall be subject to a lien in favor of Associates in the amount of $, unless expressly released in writing by Associates."
The amount was left blank. Why, does not appear. This paper, called a "financing agreement" by the parties, was recorded by Northern.
The construction loan of $7,500 was produced by Northern. The dwelling was completed about December 15, 1956. There was then due the builder, over and above the cash that the builder had received from the plaintiffs and the $7,500 construction mortgage money, a balance of $4,100. Northern was asked to produce the permanent mortgage during December 1956, but failed to do so, then or thereafter. Why, does not appear.
In January 1957 the defendant Lawyers Mortgage and Title Co. (hereafter called Lawyers Mortgage) purchased and absorbed Northern and has since continued its operations. Thereafter further demands were made by the plaintiffs for the permanent mortgage, to no avail. In the meantime *335 the builder was pressing for the $4,100. On February 6, 1957 plaintiffs' lawyer wrote defendant, enclosing a letter from counsel for the builder which demanded the balance due the builder. Plaintiffs' lawyer concluded his letter by saying that if defendants would not produce the permanent mortgage, plaintiffs would have to look elsewhere. The testimony does not show any reply from the defendant to that letter. Mr. Frega testified that he spoke to the defendant's agents repeatedly, and told them "that was our greatest concern at the time * * * threatened action by the builder."
On March 26, 1957 plaintiffs' attorney again wrote defendants, as follows:
"Not having heard from you a loan has been made from another source.
The commitment provided that the construction loan obtained by you was to run for a period of six months from October 16, 1956, the date of said commitment. Accordingly it is my expectation to be able to pay off the construction loan within the six-month period so that we will not run into any trouble with the River Edge B. & L. Ass'n.
The search of the title reveals the following: `Financial Agreement made November 16, 1956 between Nicholas P. Frega and Susan Frega, his wife, and Northern New Jersey Mortgage Associates', recorded in Book of Mortgages 3262-662.
Will you forward to me this instrument prepared for cancellation so the same can be removed from the record."
On March 27 defendant Lawyers Mortgage replied to plaintiffs' attorney as follows:
"We acknowledge receipt of your letter dated March 26th and wish to advise you that for the release of our Financing Agreement, we will require 2% of the construction loan amount, or $150.00, in accordance with the terms set forth in said instrument.
Upon receipt of Mr. Frega's check in the above amount, we will forward release of the Financing Agreement." (Emphasis ours.)
To this plaintiffs' attorney quickly replied, by letter addressed to Lawyers Mortgage, that the "$150.00 or 2% of the construction loan amount" had long before been paid by Frega to Northern (together with a $50 "application fee"), *336 at or before the time the construction mortgage was closed, and again plaintiffs' attorney asked for the cancellation of the financing agreement, "so that the construction loan mortgage can be discharged and the permanent loan placed on record."
Lawyers Mortgage, undaunted, replied that it would not cancel the financing agreement unless it was paid $150. The builder's attorney also spoke to Lawyers Mortgage about releasing the financing agreement, but got the same reply.
Lawyers Mortgage apparently represented River Edge Savings and Loan Association, the construction mortgagee, for Lawyers Mortgage wrote a letter to the attorney for the builder on April 5, 1957, obviously for use at the closing of the permanent mortgage which plaintiffs had obtained elsewhere, in which it gave the amount required to pay off the River Edge Savings and Loan Association Construction mortgage. The letter concluded:
"We further advise that there is due Lawyers Mortgage and Title Company (successor to Northern New Jersey Mortgage Associates) the amount of $150 per enclosed invoice, for release of Financing Agreement made by Nicholas P. Frega and Susan Frega, his wife to Northern New Jersey Mortgage Associates dated November 16, 1956 and recorded November 21, 1956 in Book 3262, page 662.
Upon receipt of checks in payment of these accounts, we will secure and forward to you release of the Financing Agreement and mortgage to River Edge Savings and Loan Association, properly endorsed for cancellation.
Very truly yours,
Lawyers Mortgage and Title Company"
The new mortgagee advised the Fregas that it would not close the mortgage loan unless the financing agreement was cancelled of record. Consequently, at the closing $150 was deducted by the new mortgagee from the mortgage funds and forwarded by it to Lawyers Mortgage, which then cancelled the financing agreement. About a month later plaintiffs commenced this action.
The first count in the complaint is in contract, for breach of the commitment agreement to provide the permanent *337 mortgage for the plaintiffs. The second count alleged, among other things, that
"7. Plaintiffs requested and demanded that the defendants Northern New Jersey Mortgage Associates and Lawyers Mortgage and Title Company release the said `Financing Agreement' and remove the false and fraudulent lien and claim from plaintiffs' property.
8. Defendants willfully, wantonly, maliciously, and fraudulently refused to release the aforesaid `Financing Agreement' and continued to maliciously interfere with the property right of the plaintiffs despite the knowledge that defendants had breached their agreement, had not secured and arranged financing for the plaintiffs, and that the said `Financing Agreement' was void and unenforceable and that the defendants had no lien upon plaintiffs' premises.
9. As a result of the aforesaid willful, wanton, malicious, and fraudulent acts of the defendants, and as a result of the fraudulent scheme and plan of the defendants, plaintiffs ... were unable to secure such mortgage loan upon said premises until they paid an unjust sum to the defendant Lawyers Mortgage and Title Company in order to remove the said false lien and cloud upon the title to their premises."
Plaintiffs demanded punitive damages on the second count.
The above quoted allegations spell out "an action for slander of title  the false assertion that complainant's land was encumbered by the mortgage," to the damage of the plaintiffs. Bogosian v. First National Bank of Millburn, 133 N.J. Eq. 404, 406 (Ch. 1943); Restatement of Torts, secs. 625, 629, 630; Annotation "Recording of instrument purporting to affect title as slander of title," 39 A.L.R.2d 840; 33 Am. Jur., Libel and Slander, sec. 343, pp. 310 et seq.; Ezmirlian v. Otto, 139 Cal. App. 486, 34 P.2d 774 (D. Ct. App. 1934); Olsen v. Kidman, 120 Utah 443, 235 P.2d 510 (Sup. Ct. 1951); Vaught v. Jonathan L. Pettyjohn & Co., 104 Kan. 174, 178 P. 623 (Sup. Ct. 1919); Greenlake Inv. Co. v. Swarthout, 161 S.W.2d 697 (Mo. Ct. App. 1942); Reaugh v. McCollum Exploration Co., 139 Tex. 485, 163 S.W.2d 620 (Sup. Ct. 1942); Collins v. Whitehead, 34 F. 121 (Cir. Ct. Colo. 1888); Lacroix v. Villio, 123 La. 459, 49 So. 20 (Sup. Ct. 1909); Cawrse v. Signal Oil Co., 164 Or. 666, 103 P.2d 729, 129 A.L.R. 174 (Sup. Ct. 1940); Ghiglioni v. Friedman, 115 App. *338 Div. 606, 100 N.Y.S. 1024 (App. Div. 1906). See also Stiles v. Kuriloff, 6 N.J. Misc. 271, 141 A. 314 (Cir. Ct. 1928); (the result reached in this case may be erroneous; Restatement of Torts, sec. 633, p. 348). Cf. Brady v. Carteret Realty Co., 67 N.J. Eq. 641 (E. & A. 1905); Andrew v. Deshler, 45 N.J.L. 167 (E. & A. 1883); Plainfield Bldg. & Land Co. v. N.J. Mortgage and Title Guarantee Co., 14 N.J. Super. 384 (App. Div. 1951).
"In order that a statement may be disparaging to another's property in land or other things, it is not necessary that it shall deny the other's ownership. It is disparaging if it casts doubts upon the extent of the other's ownership, as by the assertion of an easement over land or a lien thereon." Restatement of Torts, sec. 629, comment (d), p. 340.
In most of the cases cited above, the defendants did not deny the plaintiff's ownership, but asserted a lien or other right with the intent to obtain a pecuniary benefit to which they knew they were not entitled.
And
"* * * the existence of personal ill will or a desire to cause loss or knowledge of the falsity of disparaging matter * * * may make the publisher liable for punitive damages * * *" Restatement of Torts, sec. 625, comment (d), p. 332.
The defendant argues that there was no proof that the financing agreement was not recorded by the defendant in good faith, or that the defendant did not at that time intend to perform the promise to produce the mortgage. Assuming that to be so, it is not an answer to what is here alleged. While an equitable lien, as distinct from a common law or statutory lien, may be created on real estate by express contract (33 Am. Jur., Liens, secs. 18 and 19; Temple v. Clinton Trust Co., 1 N.J. 219, 226 (1948)), any such encumbrance must be based upon a legal claim and is no stronger than the alleged debt or obligation it purports to secure. Cf. Stec v. Weigang, 115 N.J.L. 292 (Sup. Ct. 1935); Chasan v. Kolb, 2 N.J. 263, 268 (1949). Here, *339 after defendant had breached its contract to produce the mortgage and there obviously was nothing due or to fall due upon the "financing agreement," the defendant falsely stated that there was, for the purpose of extorting $150 from the plaintiffs to which the defendant knew it had no right. That is slander of title at the time of the false claim, and, if proven, would justify recovery even if the original recording was not wrongful.
The defendant further argues that since plaintiffs were awarded their compensatory damages on count one, count two was properly dismissed because punitive damages are not recoverable for breach of contract. However,
"where a person has an alternative right to sue for a breach of contract or for a tort, the fact that the act constituted a breach of contract does not preclude the award of punitive damages if the action is brought for the tort." Restatement of Torts, sec. 908, comment (b), p. 555.
It seems to us that at least $150 of the $250 awarded as damages on the first count would more properly have been awarded as compensatory damages on the second count. After the trial judge had dismissed the second count, and the defendant rested without offering any evidence, the judge said: "The court will enter a directed verdict in favor of the plaintiffs and against the defendant for the sum of $250  $150 for the amount demanded for the cancellation of the lien which the court feels was improperly demanded, and an additional $100 for the inconvenience and time suffered by the defendants in the removal of this lien and in securing another mortgage." The first count was for breach of the contract to provide a mortgage. If the $150 had been paid and received for producing a mortgage, the failure to produce the mortgage would have entitled plaintiffs to the refund of the $150 on the first count, on the basis of failure of consideration. Otherwise the $150 was being refunded not because it had not been earned, but because it had been extorted. By the same token, so much of the $100 as was allowed for "the removal of this lien" could have been allowed *340 under the second count. The fact that the second count asks for punitive damages, but does not expressly ask for compensatory damages, does not prevent the court from granting compensatory damages as well as punitive damages. Cf. Randezzo v. Bacque, 37 N.J. Super. 548 (App. Div. 1955); Eatley v. Mayer, 9 N.J. Misc. 918, 919, supra. Simply because the complaint here asked for compensatory damages in the first count and punitive damages in the second count does not make the second count a mere addendum to the first, asking punitive damages. The second count sets forth an independent cause of action in tort. Cf. Restatement of Torts, sec. 908, especially comments (b), (c); Schwarz Bros. Co. v. Evening News Pub. Co., 84 N.J.L. 486, 496-7 (Sup. Ct. 1913); Eatley v. Mayer, 9 N.J. Misc. 918, 919, 154 Atl. 10, 11 (Cir. Ct. 1931), affirmed sub nom. Eatley v. Mayer, 10 N.J. Misc. 219, 158 A. 411 (Sup. Ct. 1932).
Defendant argues also that there was no proof of actual malice "as required to support the verdict for punitive damages" and therefore the second count was properly dismissed.
We will assume for the purposes of this case that malice must be shown as an element of the cause of action for slander of title. See Andrew v. Deshler, supra; Annotation, "Malice as element of action for slander of title," 129 A.L.R. 179; Cf. Mayflower Industries v. Thor Corp., 15 N.J. Super. 139, 153 (Ch. Div. 1951), affirmed, 9 N.J. 605 (1952). We will not pause to explore the distinction between express or actual malice, sometimes called malice in fact, and implied malice, or malice in law, as that distinction affects actions for slander of title, because in the case at bar we have no doubt whatever that if the testimony had been permitted to go to the jury without defense or explanation it would have justified a verdict of express or actual malice, and punitive damages. There was no testimony whatever, when plaintiffs rested, as to why defendant never produced the permanent mortgage. There was no evidence whatever of excuse, mistake, or any other fact to indicate that there was the slightest *341 justification for the demand of $150, or that it was asked for in good faith, or in the honest belief that defendant was entitled to it. For aught that appeared when plaintiffs rested, it was as the trial judge said  "* * * they were held up for $150 * * *." That certainly should spell out malice. As the court said in Collins v. Whitehead, supra (34 F., at page 123):
"Certainly one who wantonly puts on record such a paper, apparently with the intent to compel the owner of the property to come to terms with him, ought not to have refuge in the technicalities or weakness of the law * * *. It would be a reproach of the law to give only nominal damages in such a case. * * *"
See also Restatement of Torts, secs. 625, 908; Olson v. Kidman, supra; Greenlake Inv. Co. v. Swarthout, supra; Lacroix v. Villio, supra; Reaugh v. McCollum Exploration Co., supra.
Plainfield Building & Land Co. v. N.J. Mortgage & Title Guarantee Co., supra, is not to the contrary. That case turned upon the question of duress. In that case the plaintiff was a developer, with adequate funds to pay what the defendant demanded, and with adequate time and money to go into Chancery for relief. The court there said (14 N.J. Super., at page 389):
"Even if defendant in the summer of 1947 wrongfully threatened to refuse cancellation of the mortgage, it is clear that plaintiffs had adequate means for protecting themselves without paying the bonuses demanded. From the beginning of July, 1947, when plaintiffs were warned that the defendant would or might insist on the payments, until the first payment of a disputed charge of $75, November 1, four months elapsed; and until January 11, 1949, the date of the last of the payments, a year and a half passed. Plaintiffs had more than ample time for consideration and for taking whatever legal action might be advisable."
Here the situation was entirely different. The testimony shows Frega was a wage earner. Apparently all of his cash was in this property. He owed the builder $4,100, and the builder was threatening to sue. His construction mortgage of $7,500 was about to fall due. There was little, if any, *342 time to sue in equity, but assuming there was, how could he keep the builder from suing him? And what about the expense of litigation? How much would he have to pay his lawyer, and for court costs? He might get very little, if any, of these expenses back, and that only after litigation which might take him away from his employment. Under these facts, it seems to us that Frega paid under duress. Cf. S.P. Dunham & Co. v. Kudra, 44 N.J. Super. 565 (App. Div. 1957).
For the foregoing reasons the trial court should not have dismissed the second count at the end of the plaintiffs' case. The judgment is reversed to the end that there may be a trial upon that count.