HORACE N. RUBENSTEIN, PLAINTIFF-APPELLANT, v. NATALIE RUBENSTEIN AND NATALIE'S REALTY CO., INC., A BODY CORPORATE, DEFENDANTS-RESPONDENTS, AND FRANK GRANT, INTERVENER-RESPONDENT.

Argued October 31, 1955—Decided January 9, 1956.

*Mr. Ward Kremer* argued the cause for appellant.

*Mr. John C. Givens* argued the cause for respondents (*Mr. Theodore D. Parsons*, of counsel; *Messrs. Parsons, Labrecque, Canzona & Combs*, attorneys).

*Mr. M. Raymond McGowan*, of counsel with intervener-respondent (*Messrs. Barkalow, McGowan & Krusen*, attorneys).

The opinion of the court was delivered by

HEHER, J. The judgment of the Appellate Division of the Superior Court affirming the Chancery Division's judgment dismissing the complaint was certified here for appeal at the instance of plaintiff.

The gravamen of the complaint is that plaintiff, while "in fear of his safety and under duress" practiced by his defendant wife, by a deed of conveyance in which she joined, conveyed to her wholly-owned corporation, Natalie's Realty Co., Inc., all his right, title and interest in a farm of 126½ acres containing a 14-room dwelling house and several farm buildings, situate on the Freehold-Matawan Road in Marlboro Township, Monmouth County, known as the "Marlboro Manor Farm," of the value of $90,000, and a plot of ground and a factory building on Dowd Avenue in Farmingdale, Monmouth County, of the value of $12,000, both tracts then being held by plaintiff and his wife in a tenancy by the entirety. The intervener-respondent was made a party defendant as the purchaser of 110 acres of the farm property for $23,000, by contract made with Natalie and her corporate co-defendant, a price said to be "far below its present market value."

The complaint charges that by the conveyances thus made plaintiff "has divested himself of all his real property and all his assets"; that "when he made the said conveyances and thereafter" Natalie "promised and agreed that she would support" their two infant children, Leon, 5½ years of age, and Norman Thomas, 2½ years old, "out of the incomes" of these properties; that the farm land which Natalie "proposes to sell has been under lease," yielding $2,500 annually; and that the farm property, "if properly managed, would produce sufficient revenues to provide for the support, maintenance and education of the infant children," but if 110 acres be sold at the stated price "the property will be so depreciated in value that the interest of the infants will be seriously jeopardized."

The relief sought is a reconveyance of an undivided half interest in the properties or, in the alternative, the transfer to plaintiff of shares of the capital stock of the defendant corporation equal to one-half of the capital stock outstanding or, by an amendment of the prayer made some four months

after the filing of the complaint, the imposition of a trust upon the land "in favor of the infant children of the marriage."

The dismissal of the complaint came at the close of the plaintiff's case, on defendants' motion. The Chancery Division found that, "taking the plaintiff's testimony * * * at its strongest as sworn testimony, and giving the testimony the benefit of every reasonable and logical conclusion to be drawn therefrom, it does not spell out what, under the cases, is required to prove duress, a course of action which leaves the person at whom it is directed bereft of free will and his own mind"; that a motion to dismiss at the close of the plaintiff's case is well founded unless duress be proved "rather clearly," and that standard of proof was not satisfied here.

The Appellate Division, in an unreported *per curiam* opinion, concurred in the view of the trial judge that "it did not clearly appear that the threats and other conduct of Mrs. Rubenstein in the surrounding circumstances actually subjugated the mind and will of the plaintiff and constituted the efficient cause of his execution of the deed of conveyance," and thus there was an "absence of proof of causative duress" which called for a dismissal of the complaint without hearing evidence from the defendants.

Referring to observations of the trial judge in the course of the hearing that he would consider the "several factors" "by word or deed" which the plaintiff said "led him to fear for his life," but he would not allow him to "give us the mental processes which led him to his stated conclusion that he was in fear of his life," the Appellate Division said:

"We are not certain that we exactly understand what the trial judge encircled in the category of the 'mental processes' of the plaintiff. Assuredly the efficiency of duress inheres in its resultant dominance of the reactive mind of the person upon whom it is practiced. A mental attitude or state evoked by an external influence is doubtless the product of the processes and operations of the mind. We refrain from any implied confirmation of the rule as stated by the trial judge, but we have examined the proceedings to ascertain whether the application of the announced ruling prejudicially deprived the plaintiff of substantial justice in the present case. We

think not. The threatening and coercive circumstances and the plaintiff's asserted consequential state of mind were none the less comprehensively elicited and disclosed."

 If these conveyances were procured by means of duress, they are inoperative and voidable. Actual violence is not an essential element of duress of the person, even at common law, because consent is the very essence of a contract and, if there be compulsion, there is no actual consent. And moral compulsion, such as that produced by threats to take life or to inflict great bodily harm, as well as that produced by imprisonment, came to be regarded everywhere as sufficient in law to destroy free agency, indispensable to the consent without which there can be no contract. Duress in its more extended sense means that degree of constraint or danger, either actually inflicted or threatened and impending, sufficient in severity or in apprehension to overcome the mind or will of a person of ordinary firmness, according to the earlier rule, but now, by the weight of modern authority, such as in fact works control of the will. There are two categories under the common law: duress *per minas* and duress of imprisonment. Duress *per minas* at common law "is where the party enters into a contract (1) For fear of loss of life; (2) For fear of loss of limb; (3) For fear of mayhem; (4) For fear of imprisonment"; and some of the later English cases confine the rule within these limits, while the American rule is more liberal and contracts procured by threats of battery to the person, or the destruction of property, were early held to be voidable on the ground of duress, "because in such a case there is nothing but the form of a contract, without the substance." *Brown v. Pierce*, 7 *Wall*. 205, 19 *L. Ed*. 134 (1869). In many cases it was found to be enough that there was moral compulsion "sufficient to overcome the mind and will of a person entirely competent, in all other respects, to contract," for "it is clear that a contract made under such circumstances is as utterly without the voluntary consent of the party menaced as if he were induced to sign it by actual violence; * * *."

*United States v. Huckabee,* 16 *Wall.* 414, 21 *L. Ed.* 457 (1873).

■■ It would seem to be basic to the legal concept of duress, proceeding as it does from the unreality of the apparent consent, that the controlling factor be the condition at the time of the mind of the person subjected to the coercive measures, rather than the means by which the given state of mind was induced, and thus the test is essentially subjective.

> "The test of duress is not so much the means by which the party was compelled to execute the contract as it is the state of mind induced by the means employed—the fear which made it impossible for him to exercise his own free will * * *. The threat must be of such a nature and made under such circumstances as to constitute a reasonable and adequate cause to control the will of the threatened person, and must have that effect; and the act sought to be avoided must be performed by such person while in such condition." *Fountain v. Bigham,* 235 *Pa.* 35, 84 *A.* 131 (*Sup. Ct.* 1912).

See also *Williamson-Halsell, Frazier Co. v. Ackerman,* 77 *Kan.* 502, 94 *P.* 807, 20 *L. R. A., N. S.,* 484 (*Sup. Ct.* 1908); *Wolff v. Bluhm,* 95 *Wis.* 257, 70 *N. W.* 73 (*Sup. Ct.* 1897).

■ In the modern view, moral compulsion or psychological pressure may constitute duress if, thereby, the subject of the pressure is overborne and he is deprived of the exercise of his free will. The question is whether consent was coerced; that is, was the person complaining "induced by the duress or undue influence to give his consent, and would not have done so otherwise." *Williston on Contracts* (*rev. ed.*) *section* 1604. See *Restatement, Contracts, section* 492. It was said in the early books that there could not be duress by threats unless the threats were such as "to put a brave man in fear"; then came the qualified standard of something sufficient to overcome the will of a person of "ordinary firmness"; but the tendency of the more recent cases, and the rule comporting with reason and principle, is that any "unlawful threats" which do "in fact overcome the will of the person threatened, and induce him to do an act which he would not otherwise have done, and which he was not

bound to do, constitute duress. The age, sex, capacity, relation of the parties and all the attendant circumstances must be considered. This follows the analogy of the modern doctrine of fraud which tends to disregard the question whether misrepresentations were such as would have deceived a reasonable person, and confines the question to whether the misrepresentations were intended to deceive and did so." *Williston on Contracts, section* 1605. Such is the trend of the cases in New Jersey. *Miller v. Eisele,* 111 *N. J. L.* 268 (*E. & A.* 1933), Perskie, J. Compare *Hochman v. Zigler's, Inc.,* 139 *N. J. Eq.* 139 (*Ch.* 1946), and the earlier cases of *Slater v. Gittleman,* 103 *N. J. Eq.* 98 (*Ch.* 1928), Berry, V. C.; *Ballantine v. Stadler,* 99 *N. J. Eq.* 404 (*E. & A.* 1926); and *Ball v. Ward,* 76 *N. J. Eq.* 8 (*Ch.* 1909), affirmed *Ball v. Ball,* 79 *N. J. Eq.* 170 (*E. & A.* 1911). See also *Carpenters' Union v. Citizens' Committee,* 333 *Ill.* 225, 164 *N. E.* 393, 63 *A. L. R.* 157 (*Sup. Ct.* 1928); *Harper v. Murray,* 184 *Cal.* 290, 193 *P.* 576 (*Sup. Ct.* 1920); *Silsbee v. Webber,* 171 *Mass.* 378, 50 *N. E.* 555 (*Sup. Jud. Ct.* 1898); *Ward v. Board of County Commissioners of Love County, Oklahoma,* 253 *U. S.* 17, 40 *S. Ct.* 419, 64 *L. Ed.* 751 (1920); *Ira S. Bushey & Sons, Inc. v. W. E. Hedger Transportation Corporation,* 167 *F.* 2d 9 (2 *Cir.* 1948); *Morrill v. Amoskeag Savings Bank,* 90 *N. H.* 358, 9 *A.* 2d 519 (*Sup. Ct.* 1939); *Falgiatore v. Falgiatore,* 378 *Pa.* 586, 107 *A.* 2d 864 (*Sup. Ct.* 1954).

But the pressure must be wrongful, and not all pressure is wrongful. And means in themselves lawful must not be so oppressively used as to constitute, *e. g.,* an abuse of legal remedies. *Williston on Contracts, sections* 1606, 1607. The act or conduct complained of need not be "unlawful" in the technical sense of the term; it suffices if it is "wrongful in the sense that it is so oppressive under given circumstances as to constrain one to do what his free will would refuse." *First State Bank v. Federal Reserve Bank,* 174 *Minn.* 535, 219 *N. W.* 908, 61 *A. L. R.* 467 (*Sup. Ct.* 1928). See *First National Bank of David City v. Sargent,* 65 *Neb.* 594, 91 *N. W.* 595, 59 *L. R. A.* 296 (*Sup. Ct.* 1902).

It was said in a recent case that duress is tested, not by the nature of the threats, but rather by the state of mind induced thereby in the victim. *Ensign v. Home for Jewish Aged*, 274 *S. W. 2d* 502 (*Mo. App.* 1955).

And the "state of a man's mind is as much a fact as the state of his digestion." *Edgington v. Fitzmaurice, L. R.* 29, *C. D.* 483; 55 *L. J. Ch.* 650 (1885), Bowen, L. J. Now that the general common-law testimonial disqualification by interest no longer obtains, wherever motive, belief or intent of a party is material to the issue, it may be proved by his own direct testimony. *Mulford v. Tunis*, 35 *N. J. L.* 256 (*Sup. Ct.* 1871); *State v. Mark Len*, 108 *N. J. L.* 439 (*Sup. Ct.* 1932); *Crawford v. United States*, 212 *U. S.* 183, 29 *S. Ct.* 260, 53 *L. Ed.* 465 (1909); *Sallies v. Johnson*, 85 *Conn.* 77, 81 *A.* 974 (*Sup. Ct. Err.* 1911); *Jarrell v. Young, Smyth, Field Co.*, 105 *Md.* 280, 66 *A.* 50, 23 *L. R. A., N. S.*, 367 (*Ct. App.* 1907); *Commonwealth v. Jeffries*, 7 *Allen* 548 (*Sup. Jud. Ct. Mass.* 1863); *Noonan v. Luther*, 206 *N. Y.* 105, 99 *N. E.* 178, 41 *L. R. A., N. S.*, 761 (*Ct. App.* 1912). When the interest disqualification of a party was abolished altogether, "parties became qualified to testify to whatever other persons had been qualified to testify to, including the fact of their own intent." *Wigmore on Evidence* (*3d ed.*), *section* 581. And this of necessity involves the "mental processes" of the person subjected to the duress pleaded as the basis for relief.

Here, the trial judge said: "Anything that has been said, for example, 'I continued to be afraid,' statements to like effect that have been sprinkled through the testimony here are out as not admissible. * * * I will not allow him to testify to a state of mind." Again: "I think that we would be opening a door wide and entering into a very dangerous area if we were to allow a witness to say what his private thought was in response to an external force or statement. I can't allow it." And sustaining an objection to the question, "And will you tell the court what you feared and why?" the judge said: "I will rule as I did a moment ago that I will not let him give us the mental process which

led him to his stated conclusion that he was in fear of his life."

We come now to the case made by plaintiff which fell before the motion to dismiss. All was serene, apparently, in the domestic relation until the older boy developed a mental condition diagnosed in the Fall of 1952 as "childhood schizophrenia," a disclosure that no doubt had an emotional impact accounting in the main for the later occurrences now the subject of controversy here. In all seeming, it did not make for sympathetic understanding and dedication of the parents as one to the care and protection of the stricken child, but rather led to sharp differences of opinion, *e. g.*, as to the mode of treatment of the child, and eventually to an estrangement attended by the wife's insistent demands for the transfer of the husband's entire interest in the properties at issue, practically the whole of his possessions.

There is no occasion now to set down the plaintiff's evidence in detail. It suffices to say that he gave a circumstantial account of threats of gangster violence, arsenic poisoning, and a course of action designed to overcome his will, he affirms, culminating in his arrest for desertion and nonsupport. The arsenic threat, he said, had a background that filled him with an overpowering sense of foreboding and dread. His wife's father was then serving a life sentence in a Pennsylvania prison for murder committed while he was identified with an "arsenic ring" engaged in killings to defraud life insurers. The threats were first made in December 1952. The demand for the conveyances came in April 1953, and was refused. It was repeated at intervals until the following July, when the arsenic threat was made. He was seized with a great fear for his life and, so conditioned, he agreed the following day to make the conveyance. But he reconsidered and concluded, as a means of his own safety, to leave the farm where they resided. This he did forthwith, going to New York to visit his sister. The following day he went to his parents' home at Farmingdale, about 12½ miles from the farm. He had left his wife with $200 in bank and $300 in checks. Two or three days later, he

returned home to see the children. He told his wife to take the income from the farm "apartments and use it for living expenses." She made no demand for money. The same was true of two later visits; but on August 6, when he again called to see the children, he was placed under arrest, and his wife said as he was led away, "Now you can have time to think." He was held for action by the grand jury, and released on bail. When he called again to see the children, three days later, the demand for the conveyances was renewed, and again refused. Defendant then said she would "prosecute to the hilt"; the threats of physical violence were repeated, then and later; and she declared, "I'd be better off if you were dead." She was not in need, plaintiff testified; she had money in bank and had the farm rents to support herself and the children; and he offered to provide a weekly allowance for their support, but this she refused, insisting upon a conveyance of the properties. Shortly before October 5, 1953, after continued threats, she told him that the complaint for desertion and nonsupport was about to be heard by the grand jury "and could not be postponed"; and, in fear for his safety, he said, the threats continuing meanwhile, he finally yielded. A witness, Anna Kamish, testified that defendant told her: "He must give me the property, otherwise I will arrest him again."

The trial judge said to the plaintiff: "I saw a witness who in many ways, in the way he testified, by voice, by his answers to direct questions and so on, who to me is possessed of an insecurity from within," one who "in life hasn't faced up reality frontally and boldly"; "as on the witness stand, he has in life tended to avoid important problems, and marriage was one"; the misfortune to the child had its effect, and the plaintiff "was running from it," although he "had every desire to do what he could" for the boy. And the suggestion was made that the defendant wife's "assumption of all liabilities against the [conveyed] property was not an unmixed blessing to him"; "A big load was shifted together with the assets."

These findings suggest psychologic factors bearing on the subjective standard of free will.

The inquiry now is whether, in this posture of the proofs, it was proper to dismiss the complaint without hearing the defense.

It was not the practice of the old Chancery to entertain at the close of the complainant's case a motion by the defendant to dismiss the bill for want of sufficient evidence to sustain a decree. The defendant was privileged to rest his case upon the evidence introduced by the complainant, or to offer evidence in his own behalf, at his election. *Sawyer v. Platt*, 77 *A.* 1043 (*N. J. Ch.* 1910). Now, by the rules of civil practice regulating the exercise of the law and equity functions as merged by the 1947 Constitution, the defendant may, without waiving his right offer evidence in the event the motion is not granted, move to dismiss the action on the ground that upon the facts and the law the plaintiff has shown no right to relief. *R. R.* 4:42–2(*b*), formerly *R.* 3:41–2.

 Under the early practice, courts of equity addressed themselves to the conscience of the defendant and required him to answer upon his oath the matters of fact stated in the bill, if they were within his knowledge, and he was compellable to give a full account of all such facts, with all their circumstances, without evasion or equivocation. And the answer upon any matter stated in the bill, and responsive to it, was evidence in his own favor. *Story's Equity Jurisprudence* (11*th ed.*), *sections* 31, 1528 *et seq.* See *Hyer v. Little*, 20 *N. J. Eq.* 443 (*Ch.* 1870); *Walker v. Hill's Executors*, 21 *N. J. Eq.* 191 (*Ch.* 1870); *Sweet v. Parker*, 22 *N. J. Eq.* 453 (*Ch.* 1871); *Morris v. While*, 36 *N. J. Eq.* 324 (*E. & A.* 1882); *Manley v. Mickle*, 55 *N. J. Eq.* 563 (*E. & A.* 1897); *Ireland v. Kelly*, 60 *N. J. Eq.* 308 (*Ch.* 1900); *Daab v. N. Y. Central, etc., R. R. Co.*, 70 *N. J. Eq.* 489 (*Ch.* 1905). But under the Revised Chancery Act of 1902, *Comp. Stat.* 1910, *section* 19, the complainant could, "in any bill in chancery," pray for an answer without oath, in which case the answer was not required to be sworn to, "and the

allegations and statements therein, whether responsive or not," did not become "evidence against the complainant, except on a motion to grant or dissolve an injunction, on which motion the statements and denials in an answer duly sworn to" had the "same effect as heretofore"; and when an answer without oath was so prayed, the complainant could annex to the bill interrogatories founded on statements in the bill, and the defendant to whom the interrogatories were addressed was obliged to answer the same under oath or affirmation, "confining the answer to the interrogatory proposed," and "so far as responsive to such interrogatories," the answers were given the "same effect as the responsive allegations in answers required to be sworn to; * * *." *Rule* 68 of the old Court of Chancery, 1938, was couched in the same terms.

There was a *prima facie* showing here of a compulsive yielding to the demand for the conveyances, rather than the volitional act of a free mind, which called for a full disclosure by the defendant wife; and so it was error to entertain the motion to dismiss at the close of the plaintiff's case. The testimony of plaintiff stood unchallenged. Stress is laid upon the advantage of personal observation of the plaintiff witness in the assessment of his testimony; but this is peculiarly a case for explanation by the defendant under the same scrutiny, in particular as to dominance of will. Duress is a species of fraud, although unlike fraud, duress does not necessarily depend on the intent of the person exercising it. See *Restatement, Contracts, section* 492, *Comment A.*

The judgment is reversed; and the cause is remanded for further proceedings in conformity with this opinion.

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, BURLING, JACOBS and BRENNAN—6.

*For affirmance*—Justice WACHENFELD—1.