57 N.J. Super. 278 (1959)
154 A.2d 625
MILTON E. WOLF AND SYDELLE C. WOLF, PLAINTIFFS-RESPONDENTS,
v.
THE MARLTON CORPORATION AND HEATHER GLEN, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued September 14, 1959.
Decided October 8, 1959.
*280 Before Judges GOLDMANN, FREUND and HANEMAN.
Mr. Arlen Specter of the Philadelphia Bar argued the cause for defendants-appellants (Messrs. Powell and Davis, attorneys).
Mr. Benjamin Asbell argued the cause for plaintiffs-respondents.
The opinion of the court was delivered by FREUND, J.A.D.
Plaintiffs, husband and wife, instituted this action in the Camden County Court to recover a deposit of $2,450 which they made under a contract to purchase a house to be built for them by the defendant, The Marlton Corporation. The sale was never consummated, and the *281 defendant builder eventually sold to a third party the home which had been intended for the Wolfs. The theory of the action is that plaintiffs were at all times ready, willing, and able to comply with the building contract but that the builder unilaterally and unjustifiably terminated the contract without returning the down payment. The County Court judge, sitting without a jury, concluded in a written opinion that it was the defendant who refused to perform under the contract and that consequently a judgment in favor of plaintiffs was dictated. The Marlton Corporation (hereinafter "the builder") appeals.
The agreement of sale, entered into by the parties on March 8, 1957, called for the construction of a dwelling in defendant's housing development in Haddon Township upon the following terms:

 "Cash at signing of this agreement (inclusive of any
 deposit heretofore paid) ............................ $2,450.00
 * * * * * * * *
 An additional cash payment on or before house
 closed in ............................................ 2,450.00
 Cash at final settlement .............................. 3,100.00
 Bond and mortgage in the sum of 25 yr. conv. 5 1/2% ... 16,500.00
 __________
 Total Purchase Price .................................. $24,500.00
 * * * * * * * *

Should Buyer fail to make payment of any additional moneys as herein mentioned, or fail to make settlement as herein provided, the sum or sums paid on account may be retained by Seller either on account of the purchase price or as compensation for the charges and expenses which Seller has sustained, as Seller may elect, in which latter case this contract shall become null and void and all copies hereon shall be returned to the Seller for cancellation."
It is undisputed that the builder had completed the "closing in" of the house sometime in June 1957 and that plaintiffs did not make the second payment. Their failure in this respect is attributed to the conceded fact that they were never personally notified by the builder that the house had been "closed in." After reviewing the testimony, the trial judge stated in his opinion that the case presented a *282 "simple question" as to whether "the plaintiffs were entitled to a notice that the house was closed in or whether the defendant, without giving such notice, could claim a default * * *." He concluded that the agreement of sale contemplated the giving of such notice. Defendant does not, on appeal, challenge this portion of the opinion below. It does, however, claim that the buyers' attorney was notified of the closing in on at least four occasions during the period from July 1957 to September 1957, and that notice to an attorney handling a transaction for his client is notice to the client.
This contention was not advanced at the trial level, and we find no occasion to explore it as a matter of principle here. The evidence clearly shows that the buyers' attorney told defendant's representatives that his clients would make the second payment if defendant insisted. For reasons presently to be stated, defendant's president, Martin Field, elected not to demand the payment. Under these circumstances, defendant may not now declare a forfeiture on this basis; the doctrine of estoppel is applicable.
The alternative ground briefed on behalf of the builder as basis for a reversal fixes upon a matter of far greater import. The point is captioned: "Buyers breached the agreement of sale by preventing its performance through threats to resell the house to an undesirable purchaser and to ruin defendants' building business if defendants carried out the contract."
The factual basis for the argument raised is not developed systematically in the briefs. As to those events which contributed to a mutual unwillingness to perform the contract, we are compelled to reconstruct them piecemeal from the briefs, the opinion of the trial judge, and such portions of the testimony the appellant has seen fit to submit. It appears that the eventual collapse of negotiations had its genesis in marital difficulties between the plaintiffs experienced in the summer of 1957. Apparently because of this, plaintiffs instructed their attorney that they would like to get out of *283 the agreement of sale. The attorney in turn informed defendant's sales agent, Irving Gitomer, that there were "certain problems here," and that plaintiffs would like "to get the money back."
Mr. Gitomer testified that he spoke with plaintiffs' attorney on at least three occasions during July and August of 1957. In one such conversation, the attorney told him the Wolfs were ready, willing and able to purchase the home, even if the terms were cash, but, as Mr. Gitomer testified:
"[T]his conversation was coupled with the fact that they were reluctant to do it, but, if they had to do it, they would go through with the sale, and that a subsequent resale would be arranged to a purchaser who would be undesirable in our tract, and that we would not be happy with the results."
Martin Field had but one telephone conversation with plaintiffs' attorney, which was in the second week of September. The two discussed the possibility of a settlement, Field agreeing to honor the request for cancellation if defendant were allowed to retain $1,000 of the $2,450 deposit. Field testified as to what then ensued:
"[H]e reiterated in very strong and clear terms that if we did not accept his offer [of $450] it would be the sorriest move that I ever made in my building career. I accepted it as a threat, and I felt that at this point it was impossible to go ahead and continue with this thing. The threat was made in the terms that, `It's all right. If you are going to force us  you have got us over a barrel, and, if you are going to force us to make this settlement, we will make the settlement, but it will be the last settlement that you'll ever make, and it will be the last tract that you will ever build in New Jersey, and it will be the last house that you will sell in this tract,' and he continued, he named a few of the attorneys who lived in the tract, and said, `Don't have the fellows who live in your tract tell me I shouldn't do it. It doesn't make any difference to me. I'm telling you what I'm going to do. I'm going to do it, and it will be the sorriest thing that you have ever done.' At this point, although I had offered to refund $1,450.00, it became apparent that he was using this as leverage to drive us down to the $450.00 figure, and I told him no, that we wouldn't do it, and that's where the thing was left."
*284 The first question asked of Field on cross-examination was:
"Despite this conversation of which you speak, Mr. Field, you never notified the people to come to a settlement or closing of this thing, did you?"
He replied:
"I wasn't going to make a closing after someone threatened to ruin my building career."
Subsequently, by letter of December 30, 1957, the builder's counsel advised the attorney that by reason of plaintiffs' "material breach" of the contract, it had become "null and void" and that defendant would retain the down payment. The letter assigned as the cause of termination, "among other reasons," plaintiffs' failure to make the second payment. At the oral argument defense counsel (pro hac vice), who had prepared this letter for the builder, stated that he had advisedly used the phrase "among other reasons" because he did not deem it discreet to make written reference to the threat that had actually been made and to which Field testified.
Based upon this letter, which plaintiffs maintain constituted the first breach of contract, suit was instituted for the recovery of the deposit.
We have already stated the basis upon which the County Court entered judgment in favor of the plaintiffs. But contrary to the assertion in plaintiffs' brief that the court found as a fact that the builder's refusal to consummate the sale was not justified by any threats, we do not read the opinion below as reaching any express determination on whether the threats, assuming they were made, justified the builder in declaring a breach and refusing further performance. The court cited what it called "the so called threat"  not in relation to whether there existed any justification for the builder's course of conduct, but rather to indicate that the builder was admittedly unwilling to perform under the contract and therefore would not be heard to contend *285 plaintiffs should have made the second payment; the question of justification for the builder's action in rescinding seems not to have been adjudged. Moreover, even if the opinion is to be construed as containing an implied determination on the issue, we do not conceive that such would be a finding of fact, as distinguished from the determination of a legal issue. Whether duress exists in a particular transaction is generally a matter of fact, but what in given circumstances will constitute duress is a matter of law. Accordingly, the scope of appellate inquiry as to the correctness of the trial result is not so limited as plaintiffs suggest.
It is clear that where one party to a contract, by prevention or hindrance, makes it impossible for the other to carry out the terms thereof, the latter may regard the contract as breached and recover his damages thereunder from the first party. Tanenbaum v. Francisco, 110 N.J.L. 599, 604-605 (E. & A. 1933); Hanig v. Orton, 119 N.J.L. 248, 252 (Sup. Ct. 1938); 4 Corbin, Contracts (1951), § 947, p. 813. It is also clear that if the performance is prevented by physical threats, the threatened party may desist from performing, treat the contract as breached, and recover damages. He need not seek police protection or a judicial order to shield him in his performance of the contract. Kroop v. Scala, 5 N.J. Misc. 89, 135 A. 501 (Sup. Ct. 1927). The builder directs our attention to the last-cited case in particular. There a house owner had threatened a painting contractor that "if he went into the house to work he would cut his head off." 5 N.J. Misc. at page 90. The court held the contractor was entitled to terminate the contract and to recover his profits; he was not obliged to run the risk that the owner would carry out his threats. Defendant urges that, except for the degree of sophistication, there is no real difference between a threat to cut one's head off, there, and a threat to cut one's business head off, here.
Plaintiffs contend, however, that threats to do bodily injury involve an obviously distinguishable form of coercion *286 and that the present case is not one in which a party has physically prevented the other from carrying out the terms of a contract. We readily assent to the latter part of this argument; defendant was not physically prevented from enforcing the contract. But a distinction depending on the kind of pressure exerted carries little weight. "[D]uress is tested, not by the nature of the threats, but rather by the state of mind induced thereby in the victim." Rubenstein v. Rubenstein, 20 N.J. 359, 368 (1956). See also Wise v. Midtown Motors, Inc., 231 Minn. 46, 42 N.W.2d 404, 20 A.L.R.2d 735 (Sup. Ct. 1950); 17 C.J.S. Contracts § 175, p. 534, text at note 60. And in the present case, when plaintiffs' attorney threatened the builder that he would be ruined if the Wolfs were to be held to the bargain, the impress was the same as if physical pressure had been exerted. In the light of the Rubenstein case, it is significant, and perhaps crucially so, that defendant was as effectively prevented from forcing the Wolfs to comply with the contract as if a more immediate form of coercion had been employed.
Yet it was not indicated in the Rubenstein case that a party is to be relieved of the consequences of his action in all instances where the pressure used has had its designed effect, in all cases where he has been deprived of the exercise of his free will and constrained by the other to act contrary to his inclination and best interests. So much is evident from the court's qualification that "the pressure must be wrongful, and not all pressure is wrongful." 20 N.J. at page 367. It is also evident from the reference to 5 Williston, Contracts (rev. ed. 1937), §§ 1606, 1607, pp. 4500, 4503. That authority, in language more nearly appropriate to the facts here, states:
"Save under exceptional circumstances, the threatened act must be wrongful; it is not enough that the person obtaining the benefit threatened intentionally to injure the business, provided his threatened act was legal; and certainly there is no broad doctrine forbidding a person from taking advantage of the adversity of another to drive a hard bargain." Ibid., § 1618, p. 4523.
*287 In this regard, plaintiffs assert that, once they bought the house, they had a legal right to sell to whomever they wished. They rely on the familiar general rule to the effect that a threat to do what one has a legal right to do does not constitute duress. See, e.g., Smith v. White, 125 N.J.L. 498, 500 (E. & A. 1940); Standard Radio Corp. v. Triangle Radio Tubes, Inc., 125 N.J.L. 131 (Sup. Ct. 1940); 17A Am. Jur., Duress and Undue Influence, § 18, p. 580. Compare Id., § 11, p. 572, text at note 14. That proposition, however, is not an entirely correct statement of the law of duress as it has developed in this jurisdiction. Under the modern view, acts or threats cannot constitute duress unless they are wrongful; but a threat may be wrongful even though the act threatened is lawful. We have come to deal, in terms of the business compulsion doctrine, with acts and threats that are wrongful, not necessarily in a legal, but in a moral or equitable sense. See, generally, Woodside Homes, Inc. v. Town of Morristown, 26 N.J. 529, 544 (1958); S.P. Dunham & Co. v. Kudra, 44 N.J. Super. 565 (App. Div. 1957); Annotation, 79 A.L.R. 655 (1932).
The leading case in this State on the subject of moral duress is Miller v. Eisele, 111 N.J.L. 268, 275-276 (E. & A. 1933), where the court quoted approvingly the definition of duress set forth in the Restatement, Contracts, § 492 (g), p. 941:
"Acts or threats cannot constitute duress unless they are wrongful, even though they exert such pressure as to preclude the exercise of free judgment. But acts may be wrongful within the meaning of this rule though they are not criminal or tortious or in violation of a contractual duty. Just as acts contracted for may be against public policy and the contract vitiated for that reason, though the law imposes no penalty for doing them, so acts that involve abuse of legal remedies or that are wrongful in a moral sense, if made use of as a means of causing fear vitiate a transaction induced by that fear, though they may not in themselves be legal wrongs."
Further instructive is the decision in Hochman v. Zigler's, Inc., 139 N.J. Eq. 139, 143 (Ch. 1946). In that case, when the lease of a small businessman expired, the lessor refused *288 to renew. The lessor said, however, that he would lease to a purchaser of the business if the tenant could find one. The tenant proceeded to find a buyer who agreed to pay $7,800, but the lessor refused to execute a lease with the buyer unless the tenant paid over to him $3,500 of the purchase price. The tenant, whose business was worth but a mere $500 if forced to liquidate, succumbed to the lessor's pressure. Notwithstanding that the defendant-lessor had the undoubted legal right to refuse to execute a lease, the court concluded that any defense on this ground was but a "mere legalism." The lessor was "compelled to disgorge," the court stating:
"Judgment whether the threatened action is wrongful or not is colored by the object of the threat. If the threat is made to induce the opposite party to do only what is reasonable, the court is apt to consider the threatened action not wrongful unless it is actionable in itself. But if the threat is made for an outrageous purpose, a more critical standard is applied to the threatened action."
See also Rubenstein v. Rubenstein, supra, 20 N.J. at page 367; Fowler v. Mumford, 9 Terry 282, 102 A.2d 535 (Del. Super. Ct. 1954). Distinguish the circumstances in Ewart v. Lichtman, 141 N.J. Eq. 34 (Ch. 1947).
The sale of a development home to an "undesirable purchaser" is, of course, a perfectly legal act regardless of any adverse effect it may have on the fortunes of the developer's enterprise. But where a party for purely malicious and unconscionable motives threatens to resell such a home to a purchaser, specially selected because he would be undesirable, for the sole purpose of injuring the builder's business, fundamental fairness requires the conclusion that his conduct in making this threat be deemed "wrongful," as the term is used in the law of duress. In our judgment, wrongful pressure was brought to bear on the defendant; he was thereby compelled to forego the right to hold plaintiffs to the contract they voluntarily signed.
As we noted above, if one party prevents another from performing a contract, the latter may treat the contract as *289 breached, and recover damages. There is no reason why, in the application of this rule, economic or moral duress should not be treated as the equivalent of physical duress. We therefore hold that if the threats were in fact made and if the defendant actually believed that they would be carried out, and Field's will was thereby overborne, defendant was justified in treating the contract as breached and is entitled to recover whatever damages resulted therefrom.
We have decided that the interests of justice call for a remand of this case to the County Court. This disposition is made necessary by the circumstance that the record on appeal is somewhat obscure in several respects, now to be discussed. There is first the question as to whether the trial judge gave credence to the testimony of defendant's representatives concerning the making of the threats by plaintiffs' attorney. The opinion of the court makes reference to a "so called threat," but this terminology does not clearly make known what the actual findings of the trial judge were in this respect. This important factual issue should not be permitted to remain in doubt. Attention should also be directed to the question of whether or not the defendant's will was really overborne; that is, whether Field actually believed plaintiffs' attorney would carry out his threat and whether Field was actually fearful of the result.
The trial judge may also want to explore just what was meant by the use of the words "among other reasons" in the letter which the builder's counsel wrote plaintiffs' attorney on December 30, 1957 advising that there had been a "material breach" of the contract rendering it "null and void."
Moreover, should the trial judge decide in defendant's favor on the issue of actual duress, there remains for adjudication the actual amount by which defendant was damaged by reason of plaintiffs' breach. Although the agreement of sale provides for liquidated damages, such provision is operative only upon the contingency that the buyer failed to make additional payments or failed to make settlement, neither *290 of which, as we have seen, is the gravamen of the defense. It will therefore be necessary for the court, upon remand, to determine, from the present record if it can, whatever damages defendant sustained as a result of plaintiffs' breach.
In making these determinations, the trial judge may find useful the complete transcript of the testimony, which, as noted, has not been submitted on appeal; or he may depend upon his own recollection of the evidence, including the demeanor of the witnesses who testified. We leave to his discretion whether the taking of additional testimony is necessary.
The judgment is remanded for further proceedings not inconsistent with this opinion.