LESLIE D. ROBERTSON and EVELYN A. ROBERTSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Robertson v. Commissioner
Docket No. 6708-70.
United States Tax Court
T.C. Memo 1973-205; 1973 Tax Ct. Memo LEXIS 81; 32 T.C.M. (CCH) 955; T.C.M. (RIA) 73205; September 17, 1973, Filed Gordon F. DeHart, *82 for the petitioners. James F. Hanley, Jr., for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: Respondent determined a deficiency in petitioners' Federal income tax for the taxable year 1966 in the amount of $2,531.12. The three issues presented for decision are: (1) whether a consent extending the three year period of limitations on assessment executed by petitioners and a representative of the Commissioner is void because petitioners executed the consent under duress; (2) whether Irish Sweepstakes 2 winnings of petitioner Leslie D. Robertson from a ticket received as a gift constitute wagering income not eligible for the benefits of the income averaging provisions of section 1301 et seq.; [1] and (3) whether petitioners may deduct, under the provisions of section 212, $500 paid by petitioner Leslie D. Robertson to his brother for his assistance in collecting the Irish Sweepstakes winnings. FINDINGS OF FACT Some facts have been stipulated. The stipulation of facts and attached exhibits are incorporated by this reference. The petitioners, husband *83 and wife, resided in Montgomery, Illinois, at the time they filed their petition herein. They filed their joint Federal income tax return for the taxable year 1966 with the district director of internal revenue at Chicago, Illinois. Petitioners will sometimes hereinafter be referred to by their first names. Leslie is employed as a plumber in Aurora, Illinois, and has worked for the same employer for 28 years. Evelyn is a housewife. 3 In 1966, while attending a family reunion, Leslie's brother, Fred, in appreciation of Leslie's furnishing a barbecued ham, gave Leslie an Irish Sweepstakes ticket. In October 1966 Leslie was advised by telegram that he held a winning ticket and in November 1966 he received $27,898.50. He gave $500 to his brother, Fred, who had given him the ticket, for Fred's assistance in carrying out the mechanical steps necessary to insure that Leslie would receive the winnings, if any, that the ticket produced. Shortly after receiving the winnings, Leslie received a telephone call from a woman who identified herself as being with the Internal Revenue Service. She asked if he had won the Irish Sweepstakes. When he replied that he was the winner *84 she advised: "Well, we'll be waiting for you. This is the Internal Revenue." Leslie believed the Internal Revenue Service expected the tax to be paid on his winnings when he received such call. Petitioners employed their attorney to prepare their 1966 Federal income tax return which the attorney executed as the preparer. They reported the Irish Sweepstakes winnings as taxable income and elected to compute their tax under the income averaging provisions of the Internal Revenue Code. They claimed a deduction of $500 for the payment made by Leslie to Fred for his assistance in collecting the winnings. The return was filed on January 15, 1967. 4 Petitioners heard nothing further from the Internal Revenue Service until March 1970. Upon return to their home on March 30, 1970 from a weekend out of town, they discovered a note to them from their son advising them that a revenue agent, John Magerko, had called during their absence. Leslie called Agent Magerko the afternoon that they arrived home, which was March 30. Agent Magerko advised Leslie that he was not entitled to use income averaging with respect to wagering income, and that his income tax for 1966 must be recomputed. *85 Leslie told Agent Magerko that he didn't consider the sweepstakes winnings to be wagering income. The following day Agent Magerko telephoned Leslie at his place of employment and, because Leslie was out working on a plumbing job, a message was relayed to him to return Agent Magerko's call. He telephoned Agent Magerko late that same afternoon. At that time Leslie advised Agent Magerko that he was attempting to locate his attorney who prepared the return. Agent Magerko insisted that Leslie meet with him at the offices of the Internal Revenue Service to recompute Leslie's taxes and Leslie declined, saying that his attorney prepared the return and he must contact his attorney before he met with the Internal Revenue Service. 5 After March 30, both Leslie and Evelyn received numerous telephone calls from Agent Magerko. Leslie and Evelyn each estimated that they received at least 10 telephone calls from him during a one week period. On some occasions he called Evelyn, who advised him that Leslie was at work and would not return home until 5:00 p.m.; then on the same day he would call Leslie at his place of employment and then later in the day call Evelyn again. On March 31 or *86 shortly thereafter Agent Magerko asked Leslie to sign an agreement for extension of time to examine his income tax return. Leslie replied that he wanted to talk with his attorney before he agreed to an extension of time. Agent Magerko continued to call Leslie after that conversation. Leslie went to Agent Magerko's office and, although Magerko was not present, he had left a note for Leslie requesting Leslie to return at a later date. Leslie took time away from his job to visit Agent Magerko at the Internal Revenue Service offices. At that meeting Leslie questioned Agent Magerko's classification of the sweepstakes winnings as wagering income and Agent Magerko requested Leslie to agree to a recomputation of the tax 6 or agree to an extension of time. Agent Magerko advised Leslie that it was necessary for Leslie to agree to the extension of time because the Internal Revenue Service did not have sufficient time to keep the case open. Leslie expressed surprise that nothing had been done on his case for over three years after he received the first call from the Internal Revenue Service. The numerous telephone calls from Agent Magerko were nerve wracking to Leslie, and Evelyn became *87 very nervous and upset as a result of the calls. At some point between March 31 and April 7, Agent Magerko advised Leslie if he would not sign the agreement extending the period of limitations that his case would be "processed without him." Agent Magerko advised Leslie that if the extension agreement was not signed by him that proper procedures would be taken to collect the tax. One conversation which Leslie recalled was as follows: "* * * he made the statement if I didn't sign the extension, that he was going to go ahead and process the papers. I questioned him, I said, "What happens if I don't sign the extension?" "Well," he says, "then the tax will be collected through a proper process." I said, "What is that?" He said, "Whichever way it takes to get the money."" 7 Leslie had no advice from an attorney and had no knowledge of the procedures which Agent Magerko had at his disposal to collect the tax. Leslie believed that the Internal Revenue Service had the power to confiscate his home or put it up for sale. As Agent Magerko, in describing the property subject to collection procedures, said, "that it would be your property or anything you owned." Agent Magerko did not *88 advise Leslie of the amount of tax involved or the administrative procedures that were available to him to contest Agent Magerko's determination of that tax. Leslie had never previously had dealings with the Internal Revenue Service. Agent Magerko did not use abusive language with either Leslie or Evelyn nor was he at any time disrespectful. On April 7, 1970, Leslie and Evelyn, at their home in the presence of Agent Magerko, signed a consent extending the period of limitations on assessment which extended the period to July 31, 1970. The consent was on Form 872, "Consent Fixing Period of Limitation Upon Assessment of Income and Profits Tax." Later the same day Agent Magerko reappeared at petitioners' home to secure 8 their signatures on an additional copy of the consent. On April 10, 1970, Mr. James Perozzi, a field audit group supervisor of internal revenue agents, executed the consent on behalf of the Commissioner of Internal Revenue. Petitioners received no written communication from the Internal Revenue Service until they received the statutory notice of deficiency which was mailed to them on July 21, 1970. In his statutory notice of deficiency, the Commissioner *89 determined that $27,898.50 of petitioners' income was from wagering and they were not qualified to elect the income averaging method for computing their income tax for 1966 provided by section 1301 of the Internal Revenue Code. The Commissioner also disallowed the deduction for $500 paid to Leslie's brother, Fred, for the production of income for the reasons that it was not established that such amount was expended for the purpose designated or that it constituted an allowable deduction under section 212 of the Internal Revenue Code. ULTIMATE FINDINGS OF FACT The consent to extend the period of limitations for assessment of income tax for the taxable year 1966 was executed by petitioners under duress and it is, therefore, null and void. 9 OPINION Petitioners contend that they executed the consent to extend the period of limitation on assessment under duress which renders the consent null and void and the period of limitation on assessment expired on April 15, 1970, prior to the mailing of the statutory notice of deficiency. Section *90 6501(a) of the Code provides (with certain exceptions not material here) that income tax shall be assessed within three years after the return was filed. Section 6501(b) (1) provides that, for the purposes of section 6501, a return filed before the due date shall be considered as being filed on the date it is due. Accordingly, the period of limitations during which income tax could be assessed against petitioners for the taxable year 1966 expired on April 15, 1970, absent any extension of time. Section 6501(c) (4) of the Code provides that the period of limitation will not expire until a date that the taxpayer and Secretary or his delegate agree upon in writing if such agreement is made before the period is due to expire. The agreement involved here became effective, if at all, on April 10, 1970, when it was executed on behalf of the Commissioner of Internal Revenue. If the period of limitation on assessment expires before the statutory notice of deficiency is mailed by the Commissioner, any deficiency we would find could 10 never be assessed; therefore, we would find that a deficiency would be barred by the operation of the statute of limitations and petitioners would be entitled *91 to a decision in their favor. When the taxpayer makes a prima facie case by alleging that assessment is barred by the statute of limitations and proving the filing date of the return, the Commissioner must go forward with countervailing proof to show that for some reason that period of limitations had not expired when he issued the statutory notice of deficiency. Farmers Feed Co., 10 B.T.A. 1069 (1928); Bonwit Teller & Co., 10 B.T.A. 1300 (1928); T. W. Warner Co., 19 B.T.A. 872 (1930); Samuel G. Robinson, 57 T.C. 735 (1972). The respondent's burden of going forward with the proof is discharged by introducing into evidence a consent, valid on its face, which extends the period of limitation for assessment beyond the date the statutory notice of deficiency was mailed. Concrete Engineering Co., 19 B.T.A. 212 (1930), affd. 58 F.2d 566 (C.A. 8, 1932). The burden of proving that the consent is null and void by reason *92 of its execution by petitioners under duress is upon petitioners. Respondent contends that petitioners must prove duress by clear and convincing evidence, citing Swam v. Philpott, an unreported case ( S.D.Ill. 1968, 68-1 U.S.T.C. par. 9324). 11 That case was a jury trial and the proposition urged by respondent is contained in the charge to the jury by the district judge. Charges to a jury are often agreed to by counsel for the parties and do not necessarily restate the law. We are not convinced that the proof must be clear and convincing and respondent cites no case in which we have so held. Petitioners went forward with their proof as to duress and yet respondent suggests in his brief that petitioner Leslie D. Robertson should not be believed. Respondent did not even afford us the opportunity to judge the credibility of petitioners' testimony about the circumstances leading up to execution of the consent because he apparently chose not to call Revenue Agent Magerko as a witness. We can at least assume that insofar as any conversations with Agent Magerko are concerned, both of the petitioners spoke the truth. Wichita Terminal Elevator Co., 6 T.C. 1158 (1946), *93 affd. 162 F.2d 513 (C.A. 10, 1947). In addition to the fact that no evidence was offered to rebut the testimony of petitioners, we are otherwise convinced of the truthfulness of their testimony. Both petitioners presented the appearances of honest, forthright and candid witnesses. Leslie has held the same job as a plumber for 28 years. When he received the windfall of the Irish Sweepstakes by a gift from his brother, he employed an attorney to prepare his income tax return, reporting his winnings as ordinary income. 12 The return was filed early. He returned Agent Magerko's telephone calls. He reported to Agent Magerko's office on two occasions. The extensive cross examination of Leslie did not produce any discrepancies in his testimony nor did it otherwise lead us to alter our opinion about his veracity. He characterized the state of his mind during the period immediately preceding the execution of the consent as "nerve wracking" and he testified that Evelyn became nervous and upset. We do not find this characterization improbable. Petitioners had never previously dealt with the Internal Revenue Service and had no familiarity with its procedures. *94 When Leslie received the first call from the Internal Revenue Service, he thought they were calling to tell him he had to pay the tax immediately. It is understandable that petitioners would be upset when told that their case would be processed without them and that the Internal Revenue Service could reach Leslie's property or anything he owned, especially because Leslie was not informed of how much additional tax might be due or what procedures were available to contest Agent Magerko's determination. As unfair as some publicity may have been concerning the collection efforts of the Internal Revenue Service, such stories tend to put fear in the minds of taxpayers who do not understand how the system of determination and collection of taxes operates. 13 Respondent argues that Agent Magerko was just carrying out his job to secure the extension of time before the expiration of the period of limitations on assessment, yet Agent Magerko did not testify at all nor was there any showing that such a procedure is regularly pursued. Quite the contrary, the language of Rev. Proc. 57-6, 1957-1 C.B. 729, quoted below, with appropriate emphasis added, indicates that the *95 procedures employed by Agent Magerko do not represent the policy of the Commissioner: It is the policy of the Internal Revenue Service to secure a consent extending the statutory period of limitation upon assessment of income and profits tax, only in a case involving unusual circumstances. It is the purpose of the Service to keep to an absolute minimum the number of consents obtained from taxpayers. The Internal Revenue Service has been asked to state its policy and issue a guide for taxpayers and practitioners regarding the circumstances under which the securing of a waiver or consent provided for by section 6501(c) (4) of the Internal Revenue Code of 1954, to extend the period of limitation upon assessment of income and profits tax, is appropriate. 14 It has been the long-established policy of the Service to secure a consent, extending the statutory period of limitation, only in a case involving unusual circumstances. An examining officer must have the approval of his group supervisor prior to requesting a consent. Approval will not be granted in any case where previous contact with the taxpayer has not been made, except where compelling reasons *96 exist. It is the policy and purpose of the Service to keep to an absolute minimum the number of consents obtained from taxpayers. The audit program of the Service is set up to obtain the completion of the examination of returns within the present statutory period of limitation wherever possible. Nevertheless, situations arise which make it impossible for the examining officers to complete some of their examinations within the statutory period. As an example, an issue involved in a particular taxpayer's case may be similar to an issue in litigation in the case of another taxpayer or the same issue may be pending decision by the courts with reference to some other year of the same taxpayer. Obviously, in an instance of this nature, the examination cannot be satisfactorily completed until such time as the court's decision has been rendered and the issue resolved. Similarly, where disagreement exists regarding some complex or intricate question of fact or doubtful issues of law and sufficient time does not remain within the statutory period to permit the taxpayer to gather the necessary data to support his contentions and to avail himself of his conference and appellate rights, *97 there is no alternative, in the interest of a practical 15 administration of the tax laws, but to request a consent from the taxpayer, extending the statutory period of limitation, in order to arrive at an equitable solution to the problem involved. Also, where a net operating loss is to be applied as a carry back, sufficient time may not remain to complete the necessary audit action within the regular period and, accordingly, an extension of the period of limitation is obtained, an action of mutual benefit to the taxpayer and the Government. In these examples, and in other instances, the possibility exists that an additional or renewal consent may be found necessary. However, it is the policy of the Service to restrict additional consents to such cases as where the circumstances are, ordinarily, beyond the control of the Service and a further extension is fully justified in the opinion of the supervisory officials concerned, after a thorough review of all the facts present in the case. Moreover, there is no evidence whatever that following the execution of the consent petitioners were afforded a conference or in any way invited, or their attorney invited, to present their *98 views as to why the Irish Sweepstakes winnings resulting from a gift did not constitute wagering income. Petitioners' briefs filed herein lead us to the conclusion that a very close legal question exists because Leslie never placed a 16 wager. Consonant with the Commissioner's Rev. Proc. quoted above, Agent Magerko apparently was to obtain the consent in order to permit petitioners to present their views and for the Commissioner to consider same. We recognize that the Commissioner feels obligated to examine as many returns as possible in order to enforce the law and that is understandable. Nevertheless, when he attempts to secure a consent extending the period of limitations on assessment some three years after the return was filed and within only two weeks of the expiration of the period of limitation, from a taxpayer whose attorney prepared and signed the return and is unavailable for advice, we feel he proceeds at his own risk and, in circumstances such as these, owes more to the taxpayer than vague statements of alternatives of executing the consent or subjecting all of the taxpayer's property to seizure by the government for some unknown amount of tax. Based upon the *99 record as a whole we have no hesitancy in finding that petitioners were at least harrassed. We must consider now whether such harrassment constituted duress. We defined duress in Alfred J. Diescher, 18 B.T.A. 353, 358 (1929) as follows: 17 In modern jurisprudence the definition of duress has been enlarged much beyond the narrow limits recognized in the common law. It is now well settled that if an act of one party deprives another of his freedom of will to do or not to do a specific act the party so coerced becomes subject to the will of the other, there is duress, and in such a situation no act of the coerced person is voluntary and contracts made in such circumstances are void because there has been no voluntary meeting of the minds of the parties thereto. * * * In that case the revenue agent threatened to impose the fraud penalty against the taxpayer unless he executed the waiver (consent) extending the period of limitations on assessment. We held that the taxpayer, when he signed the waiver under such circumstances, was not acting with a free will but by coercion *100 by the will of the respondent. We said further at page 359: The parties to the waiver were not dealing with each other at arm's length and the only election enjoyed by the petitioner was the opportunity to choose what he believed to be the lesser of two evils. The waiver was signed under duress and is invalid. * * * The case is clearly parallel to the instant case. Revenue Agent Magerko offered petitioners a choice: i.e., execute the consent or subject your property to collection of the tax (of an unknown amount). 18 Respondent would have us apply the definition of duress contained in Wolf v. Marlton Corp., 57 N.J. Super. 278, 154 A.2d 625 (App. Div. Super. Ct., N.J. 1959), that the victim of duress must be threatened with a wrongful act. That court is not the highest court of New Jersey and we are unable to find a case decided by the Supreme Court of New Jersey that applies such a broad principle. The Supreme Court of New Jersey has, instead, been one of the Courts which has applied a subjective test rather than an objective test to determine what constitutes duress. In line with our opinion in Alfred J. Diescher, supra, the more modern *101 test appears more applicable to taxpayers and their representatives who have varying degrees of knowledge and experience with administration of the tax laws. In a leading case ( Rubenstein v. Rubenstein, 20 N.J. 359, 120 A.2d 11 (N.J. 1956)) the Supreme Court of New Jersey said of duress: Actual violence is not an essential element of duress of the person, even at common law, because consent is the very essence of a contract and, if there be compulsion, there is no actual consent. And moral compulsion, such as that produced by threats to take life or to inflict great bodily harm, as well as that produced by imprisonment, came to be regarded everywhere 19 as sufficient in law to destroy free agency, indispensable to the consent without which there can be no contract. Duress in its more extended sense means that degree of constraint or danger, either actually inflicted or threatened and impending, sufficient in severity or in apprehension to overcome the mind or will of a person of ordinary firmness, according to the earlier rule, but now, by the weight of modern authority, *102 such as in fact works control of the will. * * *. [At pages 13, 14 of A.2d.] It would seem to be basic to the legal concept of duress, proceeding as it does from the unreality of the apparent consent, that the controlling factor be the condition at the time of the mind of the person subjected to the coercive measures, rather than the means by which the given state of mind was induced, and thus the test is essentially subjective. The test of duress is not so much the means by which the party was compelled to execute the contract as it is the state of mind induced by the means employed - the fear which made it impossible for him to exercise his own free will * * *. The threat must be of such a nature and made under such circumstances as to constitute a reasonable and adequate cause to control the will of the threatened person, and must have that effect; and the act sought to be avoided must be performed by such person while in such condition.* * *. [At page 14 of A.2d.] In the modern view, moral compulsion or psychological pressure may constitute duress if, thereby, the subject of the pressure is overborne and he is deprived of the exercise of his free will. The question *103 is whether consent 20 was coerced; that is, was the person complaining "induced by the duress or undue influence to give his consent, and would not have done so otherwise." Williston on Contracts (rev. ed.), section 1604. See Restatement, Contracts, section 492. It was said in the early books that there could not be duress by threats unless the threats were such as "to put a brave man in fear;" then came the qualified standard of something sufficient to overcome the will of a person of "ordinary firmness"; but the tendency of the more recent cases, and the rule comporting with reason and principle, is that any "unlawful threats" which do "in fact overcome the will of the person threatened, and induce him to do an act which he would not otherwise have done, and which he was not bound to do, constitute duress. The age, sex, capacity, relation of the parties and all the attendant circumstances must be considered. This follows the analogy of the modern doctrine of fraud which tends to disregard the question whether misrepresentations were such as would have deceived a reasonable person, and confines the question to whether the misrepresentations were intended to deceive and did *104 so. * * *. [At page 14 of A.2d.] But the pressure must be wrongful, and not all pressure is wrongful. And means in themselves lawful must not be so oppressively used as to constitute, e.g., an abuse of legal remedies. Williston on Contracts, sections 1606, 1607. The act or conduct complained of need not be "unlawful" in the technical sense of the term; it suffices if it is "wrongful in the sense that it is so oppressive under given circumstances 21 as to constrain one to do what his free will would refuse." First State Bank v. Federal Reserve Bank, 174 Minn. 535, 219 N.W. 908, 61 A.L.R. 467 (Sup. Ct. 1928). See First National Bank of David City v. Sargeant, 65 Neb. 594, 91 N.W. 595, 59 L.R.A. 296 (Sup. Ct. 1902). It was said in a recent case that duress is tested, not by the nature of the threats, but rather by the state of mind induced thereby in the victim. Ensign v. Home for Jewish Aged, 274 S.W. 2d 502 (Mo. App. 1955). [At page 15 of A.2d.] The Supreme Court of Minnesota has adopted the same test in Wise v. Midtown Motors, 42 N.W. 2d 404 (Minn. 1950), and some of the language from its opinion seems particularly *105 appropriate here: We take it to be undisputed that duress is coercion by means of physical force or unlawful threats which destroys the victim's free will and compels him to comply with some demand of the party exerting the coercion. The standards of resisting power of the victim are personal and subjective rather than objective - that is, the existence of duress is to be determined by whether the coercion was of such a character as to overcome the free will of the victim rather than that of a person of ordinary courage and firmness. * * *. The test is not the nature of the threats; but rather the state of mind induced thereby in the victim, or, as said in the Ogilvie case, supra, 49 Minn. 568, 52 N.W. 218, 16 L.R.A. 376, 32 Am. St. Rep. 581, "whether or not the party really had a choice, - whether "he had his freedom of exercising his will."" Thus, the question here is whether plaintiff's free will was overcome by coercion. [At page 407 of N.W. 2d.] 22 Because a person has *106 a right to threaten to do that which he has a right to do, a threat to bring an action to enforce a lawful demand, or one which he in good faith believes to be lawful, does not constitute duress. Zimmermann v. Benz, 162 Minn. 47, 202 N.W. 272; Minneapolis Land Co. v. McMillan, 79 Minn. 287, 82 N.W. 591. But one has no right to threaten another, in order to accomplish an ulterior purpose, with a groundless action or with an action to enforce some just legal demand where the purpose is not to enforce the demand, but rather by exceeding the needs for enforcement thereof to so use legal process as to oppress his adversary and to cause him unnecessary hardship. A threat to so use legal process constitutes duress where its coercive effect is to overcome the free will of the victim. Snyder v. Samuelson, 140 Minn. 57, 167 N.W. 287; In re Prima Co., 7 Cir., 98 F.2d 952; Kunkel Auto Supply Co. v. Leech, 139 Neb. 516, 298 N.W. 150; Weber v. Kirkendall, 44 Neb. 766, 63 N.W. 35. In the Snyder case, the facts were substantially the same as those here. In that case, defendants were coerced to execute a contract *107 by threats of the commencement of a lawsuit which would cause them to "lose everything" and which would cost them more than the amount of the contract and which, as here, were repeated, in the absence of defendants' counsel, when the contract was signed, by threats of a "big lawsuit" with further trouble and more expense. We there held that under such circumstances the existence of duress was a fact question. [At pages 407, 408 of N.W. 2d.] 23 We have previously applied the modern subjective test in deciding issues of duress and relied upon Rubenstein v. Rubenstein, supra.Hazel Stanley, 45 T.C. 555, 561 (1966). Our determination of duress is made under a uniform standard instead of state law. Lola I. Brown, 51 T.C. 116, 119 (1968). We do note, however, that the United States Court of Appeals for the Seventh Circuit, to which an appeal in the instant case would lie, has found that Illinois applies the subjective test which we have adopted. Laemmar v. J. Walter Thompson Co., 435 F.2d 680 (C.A. 7, 1970). Respondent relies on United States v. Martin, 274 F. Supp. 1002 (E.D. Mo. 1967). That case is distinguishable *108 on its sketchy set of facts because, "The only evidence of duress was Martin's oral testimony that an Internal Revenue Service agent told him, "* * * you had better get down here and sign these papers or I will drag you into court." The assertion of an intention to pursue a legal remedy is not ordinarily considered duress, and this is especially true when there is ample time for investigation and deliberation." [At page 1005.] Moreover, in that case the taxpayer consulted his attorney after the threat and apparently before he executed the waiver. We conclude that the facts of the instant case amply demonstrate a case of duress. Accordingly, we hold that the 24 period of limitations on assessment expired before the Commissioner mailed his statutory notice of deficiency to petitioners. Because of our holding with respect to the statute of limitations, it is unnecessary to consider the correctness of the adjustments determined by the Commissioner in his statutory notice of deficiency. Decision will be entered for the petitioners. Footnotes
1. All references are to the Internal Revenue Code of 1954, as amended. ↩